[No. 4,125.]

JOSEPH B. HOUGHTON ET AL. v. ALEXANDER AUSTIN, TAX COLLECTOR IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO.

STATE BOARD FOR THE EQUALIZATION OF TAXES.—Section 3,666 of the Political Code is unconstitutional, in so far as it delegates to the State Board of Equalization the right to fix the rate of taxation, "after allowing for delinquency in the collection of taxes," because it is a delegation of legislative power to said Board.

IDEM.—The Legislature cannot confer on a State Board for the equalization of taxes, appointed by the Governor, the power to add to or deduct

from the assessed value of property, as fixed by the Assessors elected by the people, for such power would in effect constitute such Board of Assessors.

ENJOINING COLLECTION OF TAX.—An injunction will not be granted to restrain the collection of a tax by a sale of the property of the tax-payer. Before a Court of Equity will lend its aid in such case it must be made to appear that, after a sale, a deed is about to be executed which will cast a cloud on the title.

APPEAL from the District Court, Nineteenth Judicial District, City and County of San Francisco.

The plaintiffs were severally the owners of lots in the city and county of San Francisco, and of personal property therein, which was assessed for purposes of taxation for the fiscal year 1872–3. The defendant was the tax collector for said city and county. The Board of Supervisors of said city and county, on the seventh day of October, 1872, levied for the fiscal year ending June 30, 1873, a tax of one hundred cents on the one hundred dollars, for city and county purposes, but did not make a levy of a tax for State purposes.

By the Political Code, passed at the session of the Legislature, held in 1871–2, there was created a State Board of Equalization, consisting of three members, two of whom were appointed by the Governor, and the Controller of the State, ex officio, was the third member. Upon this Board was conferred, among others, the following powers and duties: To prescribe rules and regulations to govern Supervisors when equalizing, and Assessors when assessing, taxes; to equalize the valuation of the property of the several counties in the State, and fix the rate of State taxation. Section 3693 of the Political Code is as follows:

"3693. When the property is found to be assessed above or below its full cash value, the Board must add to or deduct from the valuation of—

"1. The real estate;

"2. Improvements upon such real estate;

"3. The personal property, except money;

"4. The amount of money;

"Such per centum respectively as is sufficient to raise or reduce it to the full cash value."

The following is section 3696 of the same code:

"3696. At the same time, the Board must determine and transmit to the Board of Supervisors of each county the rate of the State tax to be levied and collected, which, after allowing for delinquency in the collection of taxes, must be sufficient to raise the specific amount of revenue directed to be raised by the Legislature for State purposes."

Section 13 of Article XI of the Constitution is as follows:

"Taxation shall be equal and uniform throughout the State. All property in the State shall be taxed in proportion to its value, to be ascertained by law; but Assessors and Collectors of town, county, and State taxes shall be elected by the qualified electors of the district, county, or town in which the property taxed for State, county, or town purposes, is situated."

The fiscal year ending June 30, 1873, was the twenty-fourth fiscal year. Section 3713 of the Political Code made it the duty of the State Board of Equalization, for the twenty-fourth and twenty-fifth fiscal years, to fix such an *ad valorem* rate of taxation upon each one hundred dollars value of taxable property, as would raise for said years, for the General Fund, $1,190,000; for the School Fund, $240,000; for the Interest and Sinking Fund of 1857, $140,000; for the Interest and Sinking Fund of 1860, $9,000; for the State Capitol Fund, $200,000; for the Military Fund, $60,-000; for the Soldiers Bounty, Interest and Sinking Fund, $43,000; for the Soldiers Relief, Interest and Sinking Fund, $25,000; for the Pacific Railroad Fund, $105,000; for the State Normal School Building Fund, $75,000; and for the State Capitol Bonds, Interest and Sinking Fund, $35,000. By section 3,714, it was made the duty of the Boards of Supervisors of the several counties, on the first Monday of October, to fix the rate of county taxes, and to levy the State and county tax. By section 3715 it was pro-

vided that the action of the State Board of Equalization, in fixing the rate of taxation for State purposes, should be, in the absence of a levy of the same by the Board of Supervisors, a valid levy of the rate of State taxation fixed by the State Board of Equalization. Sections 3717 and 3718 make the tax upon personal property a lien on the real property of the owner from the time the personal property is assessed, and the tax on real property a lien thereon, which attaches on the first Monday in March in each year.

The total value of real estate and personal property in the several counties of the State, as fixed by the State Board of Equalization, for the twenty-fourth fiscal year, was $636,-425,240. The State Board of Equalization reduced the valuation of property in some of the counties, as fixed by the Assessors and Boards of Supervisors, acting as a board of county equalization. The State Board of Equalization, on the sixteenth day of September, 1872, levied, for the twenty-fourth fiscal year, a State tax of fifty cents on the hundred dollars. The defendant, as tax collector, advertised the property of the plaintiffs for sale on the twenty-sixth day of February, 1873, for the taxes of the twenty-fourth fiscal year, which became delinquent on the first Monday in January, 1873. This action was brought to enjoin the sale and collection of the tax. The complaint averred that the tax was a cloud on their title, and that the defendant threatened to sell and give a deed, and that the deed would be primary evidence that the property was assessed as required by law, that the valuation was equalized as required by law, that the tax was levied as required by law, and that the deed would be conclusive evidence of the regularity of the proceedings, and would cloud the title of the plaintiffs, and greatly depreciate the value of their property. The Court below granted a preliminary injunction. The defendant demurred to the complaint, the demurrer was sustained, and the plaintiffs declining to amend, final judgment was rendered for the defendant. The plaintiffs appealed.

The case was argued at great length, and submitted on the argument thus made, and the printed arguments and briefs in *Saving and Loan Society* v. *Austin*, 46 Cal. 415. A

reference to the published argument of counsel in that case will be sufficient to illustrate most of the points made here.

*J. B. Felton, W. H. Patterson* and *Alexander Campbell, Sr.,* and *I. N. Thorne* and *Nathaniel Bennett* for the Appellants.

*Creed Haymond,* for the Respondent, in relation to the injunction, argued that the collection of the tax by a sale of the property, would not be enjoined, because the tax became a lien by the statute in March, 1872, and the collector could not by any act of his, create a lien, and because the lien was not affected by a sale of the property, and that no act could be done to cast a cloud on the title until a sale, and a deed was about to be executed to the purchaser; and that, if the tax was void, no cloud could be cast on the title. He also argued that a Court of Equity would never interfere to prevent a sale of property for taxes, owing to the embarrassment it would create in the public service; and cited *Palmer* v. *Boling,* 8 Cal. 388; *Burr* v. *Hunt,* 18 Cal. 307; *Bucknell* v. *Story,* 36 Cal. 67; *Leach* v. *Day,* 27 Cal. 643; *Messick* v. *Board of Supervisors of Columbia County,* 50 Barbour, 190, and *Brewer* v. *City of Springfield,* 97 Mass. 152.

*John L. Love,* Attorney-General, and *W. C. Burnett,* also for Respondent.

By the COURT:

In view of the urgent necessity for an early decision of this cause, we deem it proper to announce the conclusions to which a majority of the Courts has arrived, reserving to each of the Justices the privilege of filing an opinion hereafter, if he shall elect to do so.

The Chief Justice, and Justices NILES and McKINSTRY, are of opinion:

1. That section 3696 of the Political Code is unconstitutional, in so far as it delegates to the State Board of Equalization the right to fix the rate of taxation, "after allowing for delinquency in the collection of taxes." They consider

this to be a delegation of legislative power in derogation of the Constitution.

2. That section 3693 of the same code in effect constitutes the State Board of Equalization Assessors, and is, therefore, in conflict with Section 13, Article XI, of the Constitution.

Justices RHODES and CROCKETT do not concur in these views; but, on the contrary, hold, that these sections are not unconstitutional for either of the reasons alleged. Moreover, they consider it as no longer an open question in this Court.

The Chief Justice and Justices RHODES, CROCKETT and NILES are, however, of opinion, that the remedy by injunction is not the proper remedy in this action. Justice McKINSTRY holds the contrary opinion as to the remedy.

Judgment affirmed.


WALLACE, C. J., concurring specially:

My views as to the constitutionality of that portion of the Political Code which creates the State Board of Equalization and defines its duties, were set forth in my dissenting opinion, in *Savings and Loan Society* v. *Austin*, 46 Cal. 415, and to those views I still adhere. But, for the reasons given in the opinion delivered by Mr. Justice CROCKETT in the same case at the last July term, I think that an injunction is not the proper remedy. I, therefore, think, that the judgment should be affirmed.

The foregoing opinion was delivered at the January Term, 1874. A rehearing was applied for by the respondent, and the following opinion was delivered at the July Term, 1874, on the application for a rehearing.


By the Court, McKINSTRY, J.:

I.

The powers of the Government of the State of California shall be divided into three separate departments—the Leg-

islative, the Executive, and the Judicial. (Constitution. Art. III.)

The Legislative power of this State shall be vested in a Senate and Assembly. (Act IV, Section 1.)

The State Board of Equalization must determine and transmit to the Board of Supervisors of each county the rate of State tax to be levied and collected, which, after allowing for delinquency in the collection of taxes, must be sufficient to raise the specific amount of revenue directed to be raised by the Legislature for State purposes. (Pol. Code, Section 3696.)

This section of the Code attempts to confer upon the State Board the power to add any sum to the amount of tax to be levied by law. We are of opinion that the Legislature cannot commit to the Board this power to increase (by way of allowance for delinquency or otherwise) the amount of the tax to be paid by the people.

In the course of the argument it seemed to be admitted that the Board had added to the amount directed to be raised by the Legislature a percentage which, in their opinion, would be sufficient to cover not only delinquencies, but "the costs and expenses of collection." If the power can be exercised at all, the Board may add the same percentage, calling it a percentage to meet delinquencies, which they in fact added to meet delinquencies and costs of collection. Or, as the sum needed is entirely a matter of conjecture, and the additions to be made in the discretion of the Board, they may add one hundred per centum, instead of the nineteen per centum which was added.

In case the Board shall over estimate the probable delinquencies, what shall become of the excess collected? Shall it be paid to the Controller as extra compensation for the arduous labors of that officer? It cannot be paid into the State Treasury, because the Legislature has directed a certain amount only to be raised.

The law-making power recognized by the Constitution may declare that the people shall be subjected to the payment of a certain sum; the State Board—if the section of the code is valid—may require the people to pay a greater

sum.   If it be said that the Legislature has subjected the people to the payment of a certain sum, and such additional sum as the State Board of Equalization shall see fit to name, we reply that neither can the Board be thus clothed with the power of imposing a subsidy, nor can the Legislature refuse to fix definitely its amount.

The members of the Legislature "to whose judgment, wisdom, and patriotism," the high prerogative of making laws is intrusted, cannot relieve themselves of the responsibility by choosing other agencies; cannot substitute the judgment, wisdom, and patriotism of others for their own. "One of the settled maxims of constitutional law," says Judge Cooley, "is that the power conferred on the Legislature cannot be delegated by that department to any other body or authority." (Cooley, Const. Lim. 116, and cases cited.)

It is said in the petition for a re-hearing, that the power of taxation is not a legislative power.   It is insisted that in England the power is vested in the Crown, and in California may be vested in the State Board of Equalization.

The first branch of this proposition is not altogether unsupported by authority.   In Hampden's case (*temp.* Charles I.), the king's counsel had found obscure records and obsolete statutes, which, as they claimed, established the right of the Crown to levy ship-money, but placed the stress of their argument on the ground that the power was innate in the person of an absolute king; and that the king of England was absolute.   The result of a series of assaults upon the rights and privileges of Parliament, of which this illegal judgment was one, was the violent death of the ill-advised monarch who attempted them.   Charles the First had his Finch and Crawley, and Vernon, as James the Second, found his Jeffries, to uphold the royal claim to inordinate prerogative.   The first of these kings perished on the scaffold, and the second was driven abroad from his dominions. Yet we are told: "The judges of England agreed that, under the English Constitution, the power [of taxation] was vested in the Crown."

Why is the history of those unfortunate kings recalled in

*Houghton* v. *Austin?* Is it claimed that the power of taxation has been exercised in England since the revolution, or that it was ever lawfully exercised? Is it the purpose to show that the power is executive, and therefore may be employed by an executive officer?

The proposition that the Legislature may do any act not prohibited by the Constitution is to be taken with the condition that the act must be legislative. The Constitution distributes all the powers of Government amongst the three departments. We are not convinced that the Senate and Assembly can exercise any other than legislative power; that power they must exercise. We doubt that there is any vague, indeterminate residium of power which is sovereign, but neither legislative, executive, nor judicial. If there be, we incline to the belief that it remains with the people, and can no more be claimed by one than by another department of the Government.

However this may be, the power of taxing the people of this State exists only in the Legislature. It is strictly legislative. A tax can only be created by law. When William and Mary were called to the throne, the Lords and Commons announced, in the celebrated declaration of rights, that without a grant of Parliament no money could be exacted by the sovereign from the subject. And never before was it claimed in the United States that taxation was not in its nature a legislative power.

It was repeatedly assumed to be a legislative power by Chief Justice MARSHALL (see, amongst others, *McCulloch* v. *Maryland,* 4 Wheat. 428; *Providence Bank* v. *Billings,* 4 Pet. 561.) Doctor Webster, in his dictionary, speaks of taxation as "probably the most difficult subject of legislation." Law-writers define "taxes" to be burdens or charges imposed by the legislative power upon persons or property, to raise money for public purposes (1 Blackwell's Tax Titles; 1 Cooley's Const. Lim. 479.) The Supreme Court of California has said that the levying of a tax is necessarily a legislative act. (*People* v. *McCreery,* 34 Cal. 454.)

Again, it is said that if it be admitted that the Legislature cannot delegate its legislative power, in a general

sense, the proposition cannot be maintained in its more re-stricted sense.    Precisely what is intended by the supposed distinction, we do not understand; and can only refer to the cases which are employed as illustrations.

In the first place, then, it is alleged that the Legislature may, and frequently does, transfer the power of taking private property for public use.

It is enough to say that laws of the kind referred to by counsel have always been defended on the ground that they do not transfer the right of eminent domain, since the Legislature determines the use for which property is to be taken to be a public use.    Thus the Legislature, in effect, declares that the taking of lands for the purposes of a railroad corporation is the application of the land to a public use.    The mere valuation of the property, so that the owner shall receive due compensation, is, and must be, done through subordinate agencies.    "The judgment, wisdom, and patriotism" of the Legislature must be employed in determining the character of the use.    This discretion cannot be delegated to others.

Secondly, it is said that the legislative power is delegated in those cases in which a statute is to take effect condition-ally, as on the happening of a future event.    In this case we are not called on to decide whether a condition that a law shall go into operation only after a popular election, for example, renders the law nugatory.    Nor is it necessary to inquire whether a distinction can be maintained between such a clause and an attempt to transfer to an individual or board the power of changing the terms and conditions—the whole tenor and effect—of a statute after it shall have left the hands of the legislators.    It is quite clear that in the latter class of cases the Legislature exceeds its authority. The law is not suspended until the happening of a certain event, but takes effect, if at all, when it leaves the Legislature; the law itself, however, providing that it may be changed and a different law substituted, in the discretion of some person or persons named.    The Legislature cannot thus abdicate its functions in favor of its own creature.

In the third place, it is said that the legislative power is

delegated to counties, towns, cities and villages. But these instances of local legislatures are referred to by the same authors and judges, who have maintained as a fundamental maxim, that the power to make laws cannot be delegated by the State Legislature. A system of local governments and municipal corporations existed in England from the earliest times, was adopted by the first settlers in America, and has never been supplanted. Some such system seems to have entered into every plan of free government entertained by our countrymen; and it is very properly assumed that such a system was in contemplation by those who framed the constitutions of the several States. "The right of the Legislature, in the entire absence of authorization or prohibition, to create towns or other inferior municipal corporations, and to confer upon them the powers of local government, and especially of local taxation and police regulation usual with such corporations, has always passed unchallenged. The Legislature, in these cases, is not regarded as delegating its authority, because the regulation of such local affairs as are commonly left to local boards and officers is not understood to belong properly to the State. (Cooley, Const. Lim. 189–190.)

The right to establish municipal or local organizations would exist were the constitution silent on the subject. If there were any doubt as to the existence of the right, it should be put to rest in California by the following provisions of the constitution, which not only recognize the power to create such local government, but make it the imperative duty of the Legislature to create them:

"The Legislature shall establish a system of county and town governments which shall be as nearly uniform as practicable throughout the State." (Art. XI., Sec. 4.)

"The Legislature shall have power to provide for the election of a Board of Supervisors in each county; and the Supervisors shall jointly and individually perform such duties as may be prescribed by law." (Sec. 5.)

"Assessors and collectors of town, county and State taxes shall be elected by the qualified electors of the district, county, or town in which the property taxed for State, county or town purposes is situated." (Sec. 13.)

"It shall be the duty of the Legislature to provide for the organization of cities and incorporated villages, and to restrain their powers of taxation, assessment," etc. (Art. IV, Sec. 37.)

"Each county, town, city and incorporated village shall make provision for the-support of its own officers, subject to such restrictions and regulations as the Legislature may prescribe." (Art. XI., Sec. 9.)

The same Constitution which places the legislative power of the State Government in the Senate and Assembly, peremptorily enjoins the creation of counties, towns, villages, and incorporated villages.. It is said "a State Constitution is not a grant, but a limitation." Properly understood, this generalization is correct, but it has no application here. The people, who placed the power of making laws in the Legislature, could further provide that the general maxim that such power cannot be delegated should be subject to certain exceptions.

An examination of the illustrations furnished by counsel shows, therefore, that in such cases the law-making power confided to the Legislature is not delegated at all, not that it is delegated in any peculiar or restricted sense.

If there were any exceptional cases, we would not be authorized to add to the list the subject of taxation, one of the most important intrusted to the legislative department, and one which, as much as any other, calls for the exercise of the judgment, wisdom and patriotism of the people's representatives. The Political Code does not contain a specific and distinct statement of the tax to be levied. This was held to be necessary by the New York Court of Appeals in *The People* v. *The Board of Supervisors of Kings County*, the Court saying: "They (the Legislature) must determine the amount necessary and-adequate, and declare the amount to be levied absolutely." This is necessary, whether the Constitution, in terms, required it or not, otherwise the whole legislative taxing power can be delegated. Of course, however, the amount is fixed in effect when the Legislature has determined the data, so that the ascertainment of the amount becomes a mere matter of arithmetical computation.

Unless we are prepared to hold, that every subject of legislation can be transferred to a "State Board," we cannot say, this matter of taxation can be thus delegated.   If there is any right of the deprivation of which the people of this country have ever been jealous, it is the right to have the burden of taxation imposed by their own representatives. "Taxation without representation" was the cause of complaint which, perhaps, more than any other evil, led to the separation of the American colonies from the mother country.   It is no more objectionable to refuse to the people a representation in the body which fixes the amount of this burden than for their representatives to abandon their duty, and put it in the power of any three men (however worthy of confidence) to fix the sum which the people shall be compelled to. pay.   Shall the people be told that the amount they will be called on to pay will be "more intelligently" fixed by the members of the Board?   This may or may not be true, but we are sure the members of that institution are not so immediately responsible to the people as are the Legislature, and. also sure that the Constitution does not confide the power of taxation, or any other legislative power, to the State Board of Equalization.

## II.

"Taxation shall be equal and uniform throughout the State.   All property in this State shall be taxed in proportion to its value, to be ascertained as directed by law, but Assessors and Collectors of town, county and State taxes shall be elected by the qualified electors of the district, county or town in which the property taxed for State, county or town purposes is situated."   (Constitution of California, Article XI, Sec. 13.)

" When property is found to be assessed (by the County Assessor) above or below its full cash value, the State Board of Equalization must add to or deduct from the valuation of: 1, the real estate; 2, improvements upon such real estate; 3, ·the personal property except money; 4, the amount of money. (!)   Such per centum respectively as is sufficient to

raise or reduce it to its full cash value." (Political Code, § 3693.)

Section 3693 of the Political Code conflicts with the thirteenth section of the eleventh article of the Constitution, and is void.

On the third day of June, 1849, General Riley, Military Commandant and Acting Governor of California, issued his proclamation calling a convention "for the formation of a State Constitution, or a plan of Territorial Government." When the convention met, the first important question discussed, was whether a State Convention or a plan of Territorial Government should be prepared. If a Territorial Government should be approved by the people and adopted by Congress, the principal expenses of its inauguration and subsequent conduct, would be payable out of the treasury of the United States. Naturally the owners of landed property, who, in the event of the creation of a State, would be compelled to bear the larger part of the burden of taxation, preferred a territorial government; and the history of the times and proceedings of the convention show that, even after it became apparent that a majority of the delegates were in favor of a State organization, a considerable number of the members of the convention still desired the establishment of a separate territorial government for Southern California. The representatives of agricultural districts feared that their districts would be disproportionately taxed under a State Government. That they were not mistaken in such anticipation, was afterwards made manifest by the disparity, in different parts of the State, between taxation and representation, which has continued up to the present time. In view of the fact, easily foreseen after the discovery of gold, that for a long period a numerical majority of the people would be residents of the mining regions where, although great fortunes would be extracted from the lands, the lands themselves could not be taxed, because the whole title would be in the United States; of the migratory character of the population of the mines; and of the personal extravagance and reckless speculation already prevalent, the members of the convention representing portions

of the country dedicated to grazing and agriculture might well fear that the power of assessment would be abused— to the injury of their constituents—if the power should be placed entirely in the hands of those who could be called on to pay but a minimum of tax upon like property. It was to "remove this fear from the minds—not of 'a half dozen native Californians,'" but of a respectable minority in the convention, and of the people whom the minority represented, that the clause was inserted in the Constitution, which gives to the voters of each county, town or district, the election of the officer whose duty it is to appraise property for the purposes of taxation.

It is not our province to determine whether the provision of the Constitution is or is not a wise one. Without some such provision, it is extremely probable that the present Constitution would not have been adopted; it is certain that the clause was the result of a compromise of interests supposed to be conflicting; a compromise to which the honor and good faith of the people who ratified the Constitution were pledged, and which every officer of this government is bound to respect.

So clearly does an examination of the question establish that the provision of the Constitution was understood by those who framed it, as placing the power of assessment in officers chosen by local constituencies, that counsel for respondent admits this to have been the intention and understanding of the native Californians in the convention— "nine in number."

To select from the list of members of the Convention such names as, in the opinion of counsel, are of Spanish origin, is not an accurate mode of enumerating the persons supposed to desire the adoption of the clause to which reference has been made. This is calculating in a circle, and the conclusion is based on the erroneous assumption that none but those who were born in California were in favor of the clause.

Nor can a provision of the Constitution, placed in that instrument for the protection of a minority, be disregarded, because its violation will deprive only a few individuals of

their constitutional rights. Such logic would justify the indefinite suspension of *habeas corpus*, or the deprivation of any of those personal rights secured (as we have fondly hoped) to each citizen, however poor, friendless, or even guilty, by the fundamental law of the land.

It is claimed, however, that the "native Californians," in their ignorance of the English tongue, or for some other reason not explained, failed to secure for the Constitution a declaration, in plain and intelligible language, which should afford them the protection the majority had promised to give. We cannot assume that the majority meant to practice a fraud upon the minority, but must believe it was intended that the thirteenth section should fairly express what was the understanding of all the members of the Convention. And we are unable to discover any ambiguity in the language of the section, much less that the language employed conveys an idea the reverse of that which was intended.

Section thirteen requires that each citizen shall be taxed in proportion to the value of his taxable property. It also declares that the mode of ascertaining the value of taxable property is to be such as is directed by law. The value may be ascertained by the personal inspection of the Assessor and the testimony of witnesses, or examination of interested parties, or in such other manner as the law may direct. But whatever the nature of the evidence on which the Assessor may be directed to act, he, the Appraiser, must be elected by the voters of his town, county, or district. It is the value which is to be ascertained, as (or in the manner) directed by law; but the officer who is to ascertain it, and the mode of his election, are fixed by the Constitution. The last clause of the section quoted commences with the conjunction " but," as if the more distinctly to preclude the forced inference that the phrase "in proportion to its value, to be ascertained as directed by law," was intended to apply to the officers, and to leave the Legislature at liberty, by adopting the code, to confer the power of valuation at San Diego upon an appointee who has never resided out of Siskiyou County, and who, while

discharging his function as appraiser, need never visit the scene of his supposed labors.

The meaning of the Constitution is plain. That instrument declares, in effect, that all property shall be taxed in proportion to its value—such value to be ascertained in the manner directed by law; but the officers by whom such value shall be ascertained shall be Assessors elected by the qualified electors of the town, county, or district in which the property is situated.

The case of *The People* v. *Salomon*, 46 Ill. 333, relied on by respondent's counsel, has no important bearing on the question: "Can this State Board determine the cash value of property for the purposes of taxation, our Constitution commanding that such valuation shall be made by Assessors chosen by the electors of the towns, counties, or districts?"

The Constitution of Illinois required that "all taxes should be levied by valuation, so that every person and corporation should pay a tax in proportion to the value of his or her property, to be ascertained by some person or persons, to be elected or appointed in such manner as the General Assembly should direct." There can be no doubt that under this provision the Legislature of Illinois had the power to provide by law for the appointment, by the Governor or otherwise, of a Board of Assessors, to be called the State Board of Equalization, or by any other name; or to create any number of boards, each to revise the assessment of that whose action should precede it. No question was made in *The People* v. *Salomon*, as to the exercise by the State Board of Equalization of the power of assessment and none could have been made, for the reason that there was no inhibition in the Constitution of Illinois of the exercise of such power by "any person or persons" elected or appointed in any way directed by the Legislature of that State. The Act of the Illinois Legislature required the State Board to equalize the taxation in the counties by an application of the doctrine of averages; and the objection urged against the statute was not that the State Boards were unauthorized to fix the value of taxable property, but

that the mode of ascertaining the value directed by the Act was invalid, because the Act adopted an arbitrary standard differing from that prescribed by the Constitution, to wit, the actual cash value.

However satisfactory the reasoning of the opinion of the Supreme Court of Illinois, it does not apply to the facts of the present case.

Nor is the view we take unsustained by authority in our own State. The principle underlying the question as to the officers who may be vested with the powers of assessment, was announced by this Court several years before the speculative scheme of the Political Code was adopted.

In *The People* v. *Hastings*, 29 Cal. 449, Mr. Justice RHODES, delivering the unanimous opinion of the Court as then constituted, said: "The constitutional requirements are not satisfied merely by an assessment made in the manner directed by law, but it is also provided that the Assessors of town, county, or State taxes shall be elected by the qualified electors of the district, county, or town in which the property to be taxed is situated, that is to say, that the assessments must be made by the person elected as an Assessor by the qualified electors of such district, county, or town. A tax, in order to be valid, must rest upon an assessment made in the mode prescribed by law, and by an Assessor elected as provided by the Constitution. This proposition requires no argument for its support, for it arises from the plain and unmistakable import of the terms employed in the section cited. In *Ferris* v. *Coover*, 10 Cal. 632, Mr. Justice FIELD says: 'In the present case the recitals show that the property was not listed and valued by the Assessor.' This is fatal to the deed."

The same learned Judge (in *The People* v. *The P. & S. V. R. R. Co.*, 34 Cal. 656), after quoting the last clause of section thirteen of the eleventh article, says: "The debates and proceedings in the Constitutional Convention show that this clause was added to the section as a safeguard against and to prevent the injurious consequences likely to flow from a system by which property in one district might be assessed by an Assessor elected in another district, or ap-

pointed from a distant part of the State. One of the strongest arguments against the clause was, that under its operation the Assessor would be subservient to the will of his immediate constituents, and in their interest would greatly undervalue their property to the detriment of the interests of the State at large. But, notwithstanding this and other arguments, the clause was added to the section, not only for the purpose of requiring the Assessors to be elected, but also to be elected by the qualified electors of their respective districts."

In *People* v. *McCreery*, 34 Cal. 433, the Court approve of the language employed in *People* v. *Savings' Union*, 31 Cal. 132, that "the very foundation for apportioning and collecting a tax upon property was the valuation; that such valuation must, under the rule of the Constitution, be made by the Assessor, and the Legislature could not supply the defect, if it existed."

*People* v. *Sargent*, 44 Cal. 430, affirms, in direct terms, *People* v. *Hastings*, the Court holding that a county Assessor cannot assess the property of a township for a tax levied on the township property to raise a fund for township purposes. (See also *People* v. *Kelsey*, 34 Cal. 475.)

Giving to the words of the Constitution their plain and natural interpretation, the State Board of Equalization cannot be clothed with the power of fixing—for the purposes of taxation—the value of real estate or personal property; and in every judgment of this Court in which the question was necessarily involved, the opinion has clearly recognized the correctness of the proposition that, although the Legislature may direct in what manner the value of property shall be ascertained, it cannot confer the power of ascertaining such value upon an officer not chosen by those whose property he is to estimate and appraise.

What is meant by that portion of section 3693 which purports to give the power to the State Board to "raise or reduce" money to its full cash value, we cannot understand, unless it was intended to authorize the Board not only to change the valuations of the Assessor, but, with respect to money, to declare, on suspicion, that there was more of

that species of property in a county than the Assessor was able to find.

It is claimed that, at the most, the constitution only requires that property shall be assessed by officers elected by the qualified electors of the town, county, or district, in the first instance, that it does not prohibit a change in the assessed value by other officers.

To state this proposition is to refute it. As the very object of the constitutional provision was to give to the electors of the town, county, or district the election of those who were to appraise their property for taxation—and the language of the Constitution clearly expresses this object—it would seem to be impossible to maintain that the State Board may make the appraisement which shall constitute the assessment to which the tax is to be applied.

## III.

Respondent asks for a rehearing. When this cause was argued a majority of the Court held that sections 3694 and 3696 of the Political Code were unconstitutional. Four of the Justices were of opinion that an order to restrain a sale for the alleged tax was properly refused by the District Court; the fifth Justice, that the injunction order should have been granted.

It is now urged that all that was said in respect to the validity of the sections of the Political Code is mere *dictum*; that nothing in effect was determined, except that the plaintiff was not entitled to the restraining order. If this statement was correct, a rehearing should not be granted on the application of the respondent, in whose favor the only material question was decided.

It is said that it was only necessary to decide that the plaintiff was not entitled to an injunction, inasmuch as if the sections referred to are unconstitutional, the Tax-collector's deed would not be a cloud on the title of the plaintiff, but would be void on its face.

The error of this position arises from overlooking the fact that before deciding the restraining order to have been properly denied, because the provisions of the Code are

unconstitutional, it was necessary to inquire whether they were constitutional.

Not only is it claimed, however, that the Court should not have passed upon the constitutional questions (although it was necessary so to do in the present case), but it is insisted, that the Court was precluded from examining these questions, because three of the judges had previously held, that the sections referred to were constitutional—in cases in which the inquiry was not necessarily involved.

In the cases cited by respondent's counsel, the Court held, that a preliminary injunction was not a proper remedy in any tax case, except after sale by the Collector, and when he was about to deliver his deed. This judgment did not depend upon the proposition, that the sections of the code were constitutional.

But we prefer to recognize the real questions presented, to adopting the technical reasoning suggested by the petition for a rehearing. Both in the *Savings and Loan Society* v. *Austin*, and in the present case, the constitutional questions were fully argued. In both cases it was proper to consider them; in the present case it is impossible to ignore them.

By invoking *stare decisis* — as the rule is asserted by counsel—an appeal is not made to the reasoning of a united Court on a former occasion, nor to the fact, that a rule of property has been established, and generally acquiesced in as correct. It cannot be claimed, that extensive rights have grown up under what was supposed to be the settled law. On the contrary, it is alleged, that all was unsettled; that a vast number of suits were pending, in which the constitutionality of the sections of the Political Code was disputed, and, that we were called on to put an end to further litigation, by reaffirming the prior decisions.

If the former decisions had not " settled " the questions, an additional decision, based merely upon the supposed conclusive authority of those which had preceded it, could not have fixed them. Whatever our differences as to some of the subjects connected with this case, we are all convinced, that a grave question of constitutional construction

cannot be definitely settled by any number of judgments which do not commend themselves to the profession, nor receive the assent of an intelligent public opinion. When such questions arise, they must be subjected to the criterion of an examination by thoughtful men, interested in public affairs; they are discussed by the bar and through the columns of the press; and, we may hope, will ultimately be solved by the Courts in such a manner as shall protect the individual citizen in the enjoyment of rights guaranteed by the instrument which is the charter of our liberties.

On a former occasion, three of the Justices of this Court satisfied themselves, that the provisions of the Political Code, to which reference has been made, could be sustained; the other two Justices were of opinion, that the provisions were directly repugnant to the Constitution. With profound respect for the ability and learning of the former majority, it is certain, that a decision thus rendered, cannot be cited as of the same controlling authority as one concurred in unanimously. And while we deeply regret, that a like diversity now obtains, no one of us can sacrifice his conviction to the opinion of another, which—as he conceives—does not declare the true construction of the Constitution.

But had the former judgment been concurred in by all the members of the Court, the doctrine of *stare decisis* could not be pressed beyond its just and established limitations.

If, after fully considering a former decision, a Judge is convinced that it is wrong, it become simply a question of public policy, whether proprietary rights have grown up to such an extent that it will produce more of evil than of good to restore the law to its integrity. Chancellor Kent remarks: "It is probable, that the records of the Courts, in this country, are replete with hasty and crude decisions; and such cases ought to be examined without fear, and revised without reluctance, rather than to have the character of our law impaired, or the beauty and harmony of the system destroyed by the perpetuity of error. Even a series of decisions are not conclusive evidence of what is law; and the

revision of a decision very often resolves itself into a question of expediency, depending upon the consideration of certainty in the rule, and the extent of property to be affected by it." (1 Kent, Com. 477.)

In *Hart* v. *Burnett*, 15 Cal. 607, Mr. Justice BALDWIN, after citing a large number of cases illustrative of the many limitations upon the effect of former decisions, adds: "The question of the conclusiveness of adjudications is not necessarily dependent upon the number of them. It is true some of the authorities use the terms 'a series of decisions,' and like expressions; but we apprehend the language was designed to amply not solely to the age of the rule, but its permanent, settled, stable character."

"We must give force to the qualifications expressed in the words 'settled,' 'acquiesced in,' and the like. They cannot mean 'settled' by the mere fact of the adjudications, for then there would be no use in the terms; they would be without meaning, for every judgment on a title would, on this construction, settle the law: nor is the acquiescence that of the parties to the cause, for they are bound to acquiesce, or at least submit. The meaning is that the sense of the profession, and of the public, has recognized the rule as fixed and established—as being closed to further debate."

And again, in the same case: "The rule itself implies that the doctrine protected by *stare decisis* cannot stand of itself. But it is a solecism to say that causes should be tried upon wrong principles—be decided against law—whether it be for the purpose of justice or not, so to decide them. The law is not so false to itself as to require its own permanent overthrow, unless the subversion be necessary to the public interests; and whether it be so necessary in a given case, is for the Court, as a matter of legal discretion, whenever the rule is invoked."

No such rule ever existed as that a Court should be absolutely bound by a previous decision. And it would be especially dangerous to apply this inexorable standard to questions decisive of the constitutional rights of the citizen. One provision of the Constitution can impose no greater

obligation than another.  It may be that at some time in
the far distant future, a plain provision of the organic law
may be temporarily lost sight of in the heat of a popular
excitement; or demagogues, by appealing to the selfish im-
pulses and the narrow and exclusive interests of classes,
may create an apparent public hostility to some constitu-
tional stipulation, which shall seem to retard the immediate
gratification of the wish of a majority.  It may be, (and, how-
ever we may congratulate ourselves that this has never oc-
curred in the past, it is not impossible that it may hap-
pen hereafter) that the members of an elective judiciary
shall be tempted to yield to what is supposed to be the
popular desire, and so deprive a citizen, or a number of
citizens, of some privilege all important to him or them,
and the disregard of which shall be equivalent to that con-
tempt for personal freedom which exists in the worst of
despotisms.  If so improbable an event shall ever occur,
the Courts will quickly become convinced of their error;
and when the people themselves shall have awakened to
the-dangerous heresy of such innovation upon their laws
and liberties, shall the judges be forever estopped from re-
curring to just and free principles by the mere repetition of
the words "*stare decisis?*"  The supposed case is perhaps an
extreme illustration, but it may become a fact-should it ever
happen that the members of a cabal—under any pretense
and for their own profitable enjoyment—shall be permitted
to absorb the powers of legislation confided to the people's
representatives; and then, clothed with the apparent ap-
probation of one department of the Government, shall de-
mand of the Courts to decide questions in such manner as
may please them, under the threat—in case of an adverse
judgment—of arraying the Legislature and people in hos-
tility to the judiciary.

## IV.

The history of the present case has informed us that an
attempt thus to influence the Judges, is not an impossible
thing.  We were told on the oral argument, with more
audacity than delicacy, that, if the Court should hold

certain provisions of the Political Code to be unconstitutional, there would be no money in the treasury wherewith to pay the salaries of the Judges.

With an equality and uniformity of taste which seems to be constitutional, it was suggested that a decision adverse to the respondent would be followed by wide-spread confusion and alarm, if not by an outburst of popular indignation.

There may be those who assume that the Judges of this Court are utterly ignorant of the spirit of the times in which we live; but we are willing to believe we have reached the condition of "progress," when it is supposed by persons, however influential, that Judges are to be driven from carrying into judgment their conscientious convictions of what the law demands, by suggestions of public hostility, encouraged, perhaps, by those who affect to regret that the Courts should place themselves in opposition to the prevailing sentiment.

We should be sorry if our sense of duty should compel us to join in a decision which was not sustained by an enlightened public opinion. In such case, whatever personal sacrifice it might involve, we should feel that we could not transfer the responsibility of our official action to others, however numerous or worthy of respect, without personal degradation; for, beyond every other consideration, is our obligation to serve the people, in this place, even against the wish of the people themselves.

We are by no means convinced, however, that the people feel the intense affection for the sections of the Code which the parent entertains for his own bantling. There is a certain regard for the democratic idea which underlies all our institutions which the mere demagogue always fails to appreciate. It is based on the firm conviction that the masses of the people will ultimately understand that the violation of a constitutional privilege in the person of the humblest citizen, is a greater evil than any inconvenience which may be supposed to exist under the government the people have solemnly adopted. We are willing to submit our views to a deliberate public opinion, which, in respect

to legal questions, is ordinarily the reflex of that of the more enlightened members of the profession, whose studies best qualify them to determine the correctness of judicial decisions. For a factitious local or temporary sentiment, sought to be created by the distribution of briefs or argu-
newspapers, before they are submitted to the
pertinacious advertising of the merits of a cause,
i in the street cars or otherwise; or by any arts
ly be resorted to for the purpose of producing
ad alarm or indignation, this Court—as it is con-
-cannot entertain a very exalted respect or admira-

tition for rehearing contains an appeal on behalf
oor and against the rich. It has been supposed
poor man is in greater danger from a breach of the
tion, as the rich man is better able to protect him-
ur duty is to declare the law without reference to
ties. Does respondent's counsel mean that this
iould uphold the provisions of the code, whether
tional or not, provided it shall seem that only rich
to be injured by an unconstitutional statute? If
proposition lacks that precision which is usually a
aristic of the statements of counsel. The poor man
resent may be the rich man of the year after next.
t stage of his accumulations will he-cease to be enti-
the protection of the laws? The time has passed,
yet arrived, when causes can be determined by ar-
caste against caste; supposing (which we deny) that
exist in this country. When that point is reached,
l inquire by virtue of what retainer counsel claims to
ent the "poor man." Meantime, the members of
ourt will continue to deem themselves as competent
tect the rights of the rich or poor as is the hired ad-
vocate who chooses to confuse his personal interests with those of a supposed class; acquiring that very wealth which is made the object of suspicion by attacks on its present possessors.

## V.

Much space is occupied in the petition for a rehearing by an elaborate exposition of the inequalities in taxation which existed prior to the adoption of the code, and an equally elaborate eulogy of the fairness and efficiency of the State Board. The denunciation or praise, if well deserved, cannot influence the Court; for however great the evil, or admirable the remedy, these considerations cannot justify the Court in sustaining a law which is clearly repugnant to the Constitution.

But when it is urged that the judicial conscience should be strained to sustain a statute apparently unconstitutional, because of its manifold beauties and advantages, it may not be improper to inquire whether it is so very desirable to have the proposed law engrafted on the effective legislation of the State.

It certainly cannot be contended that an absolute equality and uniformity can be secured through the action of the State Board of Equalization. An approximation to a just proportion can only be arrived at by honest appraisers, whether they be called assessors or equalizers; and the appraisement will approach nearer the actual value when the duty is imposed on the officer better qualified to employ an intelligent judgment in respect to the questions of valuation submitted to his decision. If the Assessor is honest, it would seem to be a fair presumption that a resident of a county, and the elect of its people, with opportunities to familiarize himself with values within his special territorial jurisdiction, will be equally qualified to estimate such values correctly with the members of a Board, who must ordinarily act upon comparisons between different portions of the State; and sometimes arbitrarily assume that property in one county is assessed too low, because property bearing the same name is assessed at a higher price in another county.

It is the duty of the Assessors to appraise the property at its cash value, and this expression is defined in the code. If an Assessor shall willfully overvalue or undervalue prop-

erty, he may be prosecuted and punished for such violation of his oath and malfeasance in office. Does the proposed law afford to the people any greater security against the malconduct of the State Board? The present members of the Board, we may confidently assume, are beyond suspicion. But we are dealing with a system, not with individuals: and, in view of the great powers at their command, who shall assume that the members of the Board will always be better men than the Assessors, because two of them are to be appointed by the Executive—not chosen by the people?

Against the danger to be apprehended that an Assessor may inadvertently or corruptly assess particular persons at too low a rate, it can hardly be said that the State Board affords protection. The individual whose property has been assessed at a fair cash valuation has no occasion to appeal to the Board of Supervisors. But if, in the opinion of the members of the State Board, the property in a county, as a whole, has been assessed too low, they may summarily raise the valuation of all the property in the county—thus unjustly adding to the tax of those whose property has already been assessed at its full value. Where, in such case, is the equality or uniformity which is the controlling idea of the Constitution?

In the judgment of the State Board of Equalization, property has been assessed by the assessors below its cash value—the percentage of value at which it has been assessed differing greatly in different counties. So much is the whole subject a matter of opinion that were another Board organized, with supervision of the proceedings of the present State Board, the former would probably discover many inequalities in the assessments of the latter Board; and this probability would not be decreased by the circumstance that such discovery would tend to prove the propriety of the existence of the supervising Board.

Yet it may be admitted that the aggregate valuation in some of the counties was much less than it should have been. The Supervisors may have placed the percentage of taxation for county purposes high upon a low valuation of

property, thus securing a sufficient income for the county, while property within the county was relieved of its just proportion of State taxation.

If such evil exists, it is not the duty of the Court to suggest a remedy.

The problem to be solved is to create some check upon undervaluations, and to remove from Assessors the temptation to make them. Perhaps the object sought may be accomplished by narrowing the limitation of the percentage of taxation for county purposes, or by changes in the criminal law or a more strict enforcement of criminal enactments.

The mode of compelling proper valuations is to be discovered and established by a Legislature composed of practical statesmen, who shall give their personal attention to the subject. The end can never be gained by an attempt to force into operation the unconstitutional provisions of law contained in the Political Code, provisions which do not guarantee the equality and uniformity from which, it is alleged, the County Assessors and Boards of Supervisors have departed.

The petition for rehearing is denied.

Mr. Justice CROCKETT, and Mr. Justice RHODES, dissented.