--------

[No. 10,107.]

# EX PARTE WALL.

48  279
81  493

48  279
114  332

48  279
134  72

POWER TO MAKE LAWS.—The power to make laws, conferred by the Constitution on the Legislature, cannot be delegated by the Legislature to the people of the State, or to any portion of the people.

STATUTE TO TAKE EFFECT UPON THE HAPPENING OF A FUTURE EVENT.—Although a statute may be conditional so that its taking effect may depend upon a subsequent event which may be named in it, yet this event must be one which shall produce such a change of circumstances that the law makers, in their own judgment, can declare it wise and expedient that the law shall take effect when the event shall occur.

LEGISLATURE MUST PASS ON EXPEDIENCY OF A STATUTE.---When the Legis-
lature passes a law, it must pass entirely upon the question of its ex-
pediency; and it cannot say that a law shall be deemed expedient, pro-
vided that the people afterwards, by a popular vote, declare it to be ex-
pedient.

IDEM.----A statute to take effect upon a subsequent event, must, when it
comes from the hands of the Legislature, be a law *in presenti* to take
effect *in futuro*. On the question of the expediency of the law, the
Legislature must exercise its own judgment, definitely and finally.

LEGISLATURE CANNOT REFER A LAW TO THE PEOPLE.---The Legislature has
no power to refer a statute to the people, to decide by a popular vote
whether it shall go into effect.

IDEM.----If a law is in existence making it a misdemeanor to retail liquors
without a license, the Legistature must determine by a statute whether
licenses shall be granted, and cannot refer the question of granting or
refusing licenses to a popular vote.

TOWN GOVERNMENTS.---The Legislature of this State has not established a
system of town governments, as required to do by section four, Art.
XI, of the Constitution.

IDEM.—The Constitution is not self-executing. Town governments must be
created by statute.

IDEM.—The words " system of town governments " used in the Constitu-
tion, were used with reference to town organizations in their gen-
eral features like those of other States where town governments had been
established when the Constitution was adopted.

POWER OF TOWN GOVERNMENTS WHEN ESTABLISHED. — When a system of
town governments shall have been established by the Legislature, and
when local town legislatures shall have been organized under that sys-
tem, the Legislature may confide to such local legislatures the right to
make local rules, but it cannot delegate to the people living within cer-
tain territorial limits, but who have no distinctive political character or
governmental organization, the power to make laws.

IDEM.---The power to make laws must be exercised by the Legislature; that
to make by-laws for a town, by the local legislature.

BY an Act of the Legislature of this State, approved
March 18, 1874, it was provided that, whenever one fourth
of the legal voters of any township, incorporated city, or
town, should petition the Board of Supervisors of the
county in which the township, incorporated city or
town was situated, to call a special election to vote
upon the question of "liquor license," or "no liquor
license," the Board of Supervisors must, within one
month after the petition was filed, call a special elec-
tion in the township, incorporated city, or town, to vote
upon the question of license to retail liquor. That at such

election the ballots must contain the words "for license," or "against license," and if a majority of the ballots were "against license," then no license to retail liquor should be granted in the township, city, or town, where the election was held; and that it should be unlawful, after the result of the election was declared, for any person to sell or dispose of any spirituous, vinous, malt, or other intoxicating liquors, in less quantities than five gallons, until at a new election to be held not less than two years after such election, a majority should vote in favor of license. The Act further provided that any person who should sell or give, or offer to sell or give any such liquors within any township, city or town, contrary to its provisions, should be guilty of a misdemeanor, and upon conviction, pay a fine not exceeding twenty-five dollars for the first offense, and not less than fifty, nor more than one hundred for each subsequent offense, and be imprisoned in the county jail until the fine was paid, for a period not to exceed one day for every one dollar of the fine.

The petitioner, George Wall, was, on the 8th day of June, 1874, convicted before a justice, of a violation of the law in the fourth township of Contra Costa County, and fined twenty-five dollars, and having failed to pay the fine, was committed to the county jail for twenty-five days, or until he should pay the fine. He applied to the Supreme Court to be released on *habeas corpus*.

*John B. Felton,* for the Petitioner.

The law is in direct opposition to the natural rights of man, as laid down in the Declaration of Rights in the Constitution of California.

The Constitution of California declares these rights to be inalienable. By consequence the Constitution has not attempted to restrict the power of the Legislature over these rights. It declares in substance that government itself has no power over them, and that, therefore, the people, the source of government, cannot delegate what they themselves never had. The rights of property, life, liberty and the pursuit of happiness precede government, and the only

limitation of these rights is the rule that they shall not be used to the injury of others.

The right of a man to use and dispose of wines, beers, liquors, etc., is a natural right of property, and can only be limited or restricted by the Legislature so far as the exercise of that right interferes with the exercise of the rights of others. The possibility that one man may use these articles of property to excess, and so injure himself or be dangerous to others, is no reason why another man should be deprived of the right to use or dispose of these articles. If a man uses these articles in excess, to his own injury only, and not to the injury of others, he is exercising a right of abusing his own property, and though blameworthy, is not within the prohibitory power of the law. If he, through an excessive use of these articles, becomes dangerous to others, he then becomes amenable to the law. But the article, the abuse of which has led to his thus becoming dangerous, cannot be taken away from others who are capable of using it in a proper manner.

The natural rights of the individual cannot be taken from him. Hence it follows that our Constitution never attempted to alienate those rights which it declares inalienable. Acting under this plan, the framers of the Constitution simply contented themselves with the general statement: "We do not propose to delegate to the Government any power over natural rights, because we have no such power;" and hence they did not attempt to put any restrictions upon the use of such powers. There was no use in putting restrictions on powers not granted at all. Thus, if a law were passed by the Legislature that every man in California should have his nose cut off, or his feet amputated, you will find no clause in the Constitution forbidding it. If the Legislature passed a law absolutely forbidding all marriages, the Constitution would be invoked in vain to find anything which prohibits the Legislature from so doing. The right given by the Constitution to the various branches of Government is to harmonize the natural rights of all. To bring about this harmony it is frequently necessary to put heavy and grave restrictions on the rights which

the individual would have if he were alone and not a member of society. But "the true principle is, that the sole end for which mankind are warranted individually or collectively in interfering with the liberty of action of any other member, is self-protection. The only purpose for which power can be rightfully exercised over any member of a civilized community, against his will, is to prevent harm to others. His own good, either physical or moral, is not a sufficient warrant. He cannot rightfully be compelled to do or forbear because it will be better for him to do so, because it will make him happier, because in the opinion of others to do so would be wise or even right. There are good reasons for remonstrating with him, or persuading him, or entreating him, but not for compelling him, or visiting him with any evil in case he do otherwise.

The Legislature cannot take away the inalienable rights of man; it can only protect them. If it passes laws the Courts have the right, and it is their duty, to examine these laws in the light of the Constitution, and declare them void when the Legislature, in passing them, has transgressed its jurisdiction. But it is said and thought by some that if a law of the Legislature is constitutional upon its face, that the Courts can inquire no further, but must uphold it. This I deny. It is the province of the Court to decide, not merely whether the law is *prima facie* constitutional, but whether it indirectly attacks the liberty of the subject. A law may be constitutional on its face, and yet be utterly subversive of inalienable rights. Suppose a law were passed that no man should build or occupy a house that was not a thousand feet square and ten stories high. Suppose all men and women under ten feet high were prohibited from marrying; that no man should own a piece of land containing less than ten thousand acres. Suppose the sale of diamonds weighing less than a pound was prohibited—would it not be clear to the most careless observer that under the guise of regulating, an attack was made upon the very essence of the rights of family and marriage? Or suppose the Legislature should pass a law that John Smith should be buried by a certain day at the

public expense. This law would, upon its face, be constitutional, for the presumption would be that John Smith was dead, and that his body ought not to be allowed to rot above ground. But it turns out, when it comes to apply the law that John Smith is alive, and that to carry out the law it is necessary to kill John Smith or bury him alive.

Now, here is a case where the law on its face is apparently for a legal and constitutional object. The unconstitutionality only appearing from a fact, *dehors* the law. Is such a law good? To hold that the Legislature can thus indirectly and covertly do what it cannot do directly; that it can attain an unconstitutional object by simply changing the mode of expression of the law, is to make all constitutional rights depend on the skill of the draughtsman. There is no usurpation that cannot be concealed under an appearance of using a constitutional power.

Let us see what prohibition does. It prohibits the use of these articles, not merely to him who makes a bad use of them, but also, to that very great class of persons who make a good use of them. The man of a melancholy disposition, the man whose blood is impoverished, the enfeebled by disease, the temperate man, who can use the good things of this life, must give up what they have a natural right to do, simply because a fellow-mortal, using the same article, is tempted to excess. I admit, fully, the great limitation which society justly puts to the use of one's own property. So use it as not to injure the property of another; or rather, let us carry the maxim further: so use your property as not to injure another. I fully concede this limitation; but here I stop. It cannot be extended to the rule, which must be laid down before prohibition is justifiable in this case—the rule that you should not use your own property at all, because another man may use his property to the detriment of himself or society.

Liquors used in moderation, and to satisfy a desire common among men, can be indulged without injury either to the man or to society. They are only dangerous when taken in excess. But the law in question is absolutely prohibitory of the right to dispose of any wines, lager beer, or

spirituous liquor, in those precincts in which the majority
of the people vote against license, on any day or at any
time.    It does not merely prohibit the sale of liquor under
five gallons, but it prohibits the sale of liquor over five
gallons as well.    By section four of the Local Option Law,
in case the majority of the votes cast at an election shall
contain the words Against License, "then it shall not be
lawful for any Court, board or officer to issue any license
for the sale of any spirituous, vinous, malt or any other in-
toxicating liquors in said township, city or town," etc.    By
this section then, no license is allowed to issue for the sale
of any liquors whatever.    Now, in case a man should want
to sell liquor over the quantity of five gallons, under the
provisions of section three, thousand three hundred and
eighty-two of the Political Code, and sections nineteen and
four hundred and thirty-five of the Penal Code, which are
not repealed by the Local·Option Law, but are in full force,
he is obliged to take out a license quarterly, under heavy
penalties, both civil and criminal.    Thus, by the Local
Option Law, the issue of any license is strictly forbidden
in any case within the precinct which has voted against
license; while, by the Political and Penal Codes, a man is
punished for selling without a license, which there is no
authority for issuing to him at all.    And thus, if a man
should sell less than five gallons, he is punished under the
provisions of the Local Option Law; while if he sells more
than five gallons, he is punished under the provisions of
the Codes.

Again, this law instead of providing against the excess
of its use, absolutely renders necessary that excess.    It
prohibits the sale in quantities that can be used with safety,
and makes it imperative on a man purchasing to buy such
a quantity as would, if he drank it, render him inevitably
drunk.    Besides that, it renders it difficult for a man of
moderate means to purchase at all, and so makes an unjust
discrimination between the rich and the poor.    Now, cer-
tainly, it would not be contended that society would have
the right to say to the poor man, you shall not drink at all,
while the rich man may drink as much as he pleases.

The statute is void, as being a delegation of general legislative powers to individuals. It is conceded that the Legislature cannot delegate its legislative power at all. (See *Houghton* v. *Austin*, 47 Cal. 646.) The only question, then, presented in this case is, whether it does involve a delegation of the legislative power?

It is also an admitted proposition that power can be delegated to local bodies to legislate over their local matters. The question in this part of the case divides itself into two questions: 1st. Is the power here delegated a power given to a locality to legislate over its local matters? 2d. If it is not, is the right which the people have under this law a delegation of legislative powers?

I shall argue the second question first: Is this law a delegation of the legislative power?

If a man passes from the precinct of Oakland to that of Alameda, he finds himself in a line which separates two townships with different laws. In one precinct he cannot buy a glass of wine without being accessory to a misdemeanor. In the other precinct, wine, lager beer and spirits are sold openly under a regular license from the Board of Supervisors of the same county in which Oakland is situated. He is naturally astonished at the difference, and asks why it is that a permitted trade in one precinct is a crime in another. "Has the Legislature passed such a law?" he asks. "No," the answer is; "the Legislature passed a law that liquor should be prohibited in those precincts where the people of the precinct said it should be prohibited, but that its sale should be permitted in those precincts where the people said it should be permitted." If this answer is correct, does it not seem too plain to admit of an argument, that the rule which forbids the liquor merchant of Oakland from selling his wares comes directly from the people, and that the Legislature has only made a rule that the people may make the rule on the subject; that the Legislature has not made the rule, but left it to the people whether it shall say: The law is that the sale of liquor shall be prohibited, or the law is the sale of liquor shall be permitted.

And when the liquor dealer of Alameda says, "the law

permits me to sell," does he not mean to say, "the people of Alameda permit me to sell?" When the liquor dealer of Oakland, on the other hand, says, "I am forbidden to sell," does he not mean to say, "the people of Oakland have forbidden me to sell." In other words, in both cases, does not the rule of action, "you may sell, or you shall not sell," emanate directly from the respective people of the two precincts? Has the Legislature done anything else than to grant to the people of each precinct the right of making a rule, each one for itself?

If this is a fair statement of the case, then we have these propositions:

The Legislature has granted to the people of each precinct the right to make one rule, or another directly the reverse. The people of one precinct have made one rule. The people of the other precinct have made the opposite rule. The people of the two precincts are living under diametrically opposite laws. Why? Because the people of one said, "you may sell;" the people of the other said, "you shall not sell." Now, in a case like this, is it susceptible of argument that the people of each precinct made the Legislative Act? They judged of its expediency; they gave it the sanction of the law. The people of Alameda said: 1st. "It is not expedient to forbid the sale of liquor." 2d. "You may, therefore, legally sell this liquor." The people of Oakland said: "It is expedient that you should be forbidden to sell liquor. Therefore, you shall not sell it, but you shall be punished with fine and imprisonment if you do." The Legislature simply said to these people: 1st. "I constitute you sole judge of the expediency." 2d. "Whatever you judge expedient, you may clothe with the full sanction of the law." In this case, then, it would seem to be too clear for argument that the Legislature had made no law, but had simply delegated to the people of the precincts, the right to make a law.

Again, if the Legislature, as is contended, did make this law, which one did it make? Did it enact that Oakland should sell no liquor, or that Alameda might? The statute is silent on both of these subjects. The Legislature has

said no such thing. It has not even considered the question what is expedient in either precinct, any more than if I say to my daughter, which of these men will you choose, and she chooses one. The man whom she has chosen is my choice. It is here exercised under my permission to her to choose.

Now, it certainly seems a self-evident proposition that in the case which I have described, all that constitutes a law, the decision on its expediency, its binding power, came from the people. All the Legislature has done has been simply to say to the people, "what is your will? If you will prohibition, your will is law. If you do not will prohibition, say so, and there shall be none." If the Legislature has this power, then it can say to the people, "murder is a crime if you say so; seduction can be punished or not at your discretion; a new Court may be created, only say the word." In other words, the Legislature can give to the whole people, or any portion thereof, the permission to say what shall be the law, and what not. If this is the case, then it follows inevitably that the Legislature can delegate its whole or any portion of its power to the people or any portion thereof. A man must be reasoned by metaphysical arguments out of his common sense before he can come to any other conclusion than that this is a delegation of the power to make a law.

Let us now go back to the original principles of things and see why it is, and under what circumstances a legislature can make a law spring into operation for the first time on the happening of a future event. It is obvious that a change in present existing circumstances may bring about a necessity that an existing law may cease and a new one go into effect. But the Legislature is not always in session, and hence a law may become, by change of circumstance, not only useless but disastrous in its consequences. It is also obvious that with this change of circumstances may come a necessity for a new law. It is given to man to foresee what will be a duty or expedient under this change of circumstances; and hence a legislature in passing a law to take effect upon a change of circumstances only judges

what changes of the law will be necessary when the present state of things ceases and a new state of things commences.

The Constitution of the State says: "In case of the impeachment of the Governor, or his removal from office by death, or inability to discharge the powers and duties of said office, resignation or absence from the State, the powers and duties shall devolve upon the Lieutenant-Governor for the residue of the term, or until the disability shall cease. But when the Governor shall, with the consent of the Legislature, be out of the State in time of war, at the head of any military force thereof, he shall continue Commander-in-Chief of the military force of the State." Now here we have various future contingencies provided for, each of which brings about a new rule of action or law. The impeachment of the Governor, or his absence, renders it necessary to have a new executive officer. His acquittal, or the removal of his disability, renders it proper that he should again be Governor. If the Legislature should consent to his being out of the State, and he should be out of the State, and there should be a war, then, in the happening of these three future events, he shall still continue to be Commander-in-Chief of the forces of the State.

Now, in all these cases we observe: 1st. That a change of existing circumstances is contemplated; 2d. That such change of circumstances will bring about the necessity of a change of the present rule of action; 3d. That the Legislature, or the mother or father, or teacher, or adviser, decides what that rule of action shall be in the event of a change of existing circumstances; 4th. That there is a logical connection, at least in the minds of the law-givers, between the event which is to happen, and the new rule of action which is consequent thereon.

If there is no new event to happen, which will render necessary a new rule of action, then the only duty of the Legislature is to frame a law for circumstances as they exist now. There is no reason in making the change of law depend on an event which does not change the present expediency. If, on the other hand, the event which is to happen does not change the present circumstances, but is an event which

leaves things just as they were before, it is an event which does not affect the expediency of the present law; then there is no propriety, reason or sense in making the taking effect of the new law depend upon this immaterial event.

As a syllogism, the case would stand thus: A Legislature may make a law dependent on a future event. The expression of the will of a certain number of people is a future event; therefore, the Legislature may make a law dependent on the expression of the will of a certain number of people. The syllogism might just as well run thus: A Legislature may make a law dependent on a future event. When John Smith kisses his wife, that is a future event. Therefore, the Legislature may make any law depend on the event of John Smith kissing his wife; so that murder may be made a crime in the event that John Smith indulges in a little affectionate embrace of his wife; but is no crime if John Smith should prefer somebody else's wife.

It is evident, then, that the event on which a law may be made to take effect, is an event which changes the present condition of things so as to render that expedient which is now inexpedient, and that inexpedient which is now expedient; and that the Legislature must determine what law will be expedient in the event happening that changes the present condition of things. If this proposition is true, as I think all will concede it to be, then what becomes of this expression of the will of the people, treated simply as a future event?

Again, if the Legislature could have a law to take effect on the happening of the vote of a majority of a precinct, it might have made it dependent on the will of a minority, or any number, or not, since the event can derive no force from the number of votes for or against. And so far does this case leave the question of a passage of the law to the will of the majority of the people, that the will of the people of the State may be overwhelmingly against forbidding the sale of liquor; yet in a little precinct of four hundred votes, two hundred and one voters will impose on the one hundred and ninety-nine voters of that precinct or town, that which the whole people of the State, outside

that precinct, may be against. To leave the question whether a law shall take effect, dependent on the will of any man, or set of men, is to substitute the will of those men in the place of what is absolutely essential to the validity of the law—that is, the will of the Legislature.

We know that the American people are brought up with the attachment to local government of towns and cities so strongly in them that it seems to be instinctive. Celebrated writers attribute the American character as distinguished from the character of other nationalities, to the fact that the town government gives firmness, independence and interest in public affairs. The Constitution seems to imply the existence of a town government with right to regulate its affairs, independent of the Legislature. (Article XI.) Thus section nine: "Each county, town, city and incorporated village, shall make provision for the support of its own officers, subject to such restrictions and regulations as the Legislature may prescribe." Here the Constitution speaks directly to the town, village, city and county. It assumes their existence. It takes away from the Legislature the power of making provision for the support of their offices.

Again: Constitution, article four, section thirty-seven— "It shall be the duty of the Legislature to provide for the organization of cities and incorporated villages, and to restrict their power of taxation, assessment, borrowing money, contracting debts, and loaning their credit—so as to prevent abuses in assessments and in contracting debts by such municipal corporations." Now, here is implied a right of the people to have these organizations; and when they exist, to have a right of local taxation. There is no provision that the Legislature shall confer upon them a right of local taxation, but only that it shall restrict a right already existing.

So, also, the Constitution is remarkable for its silence in regard to the power of taxation. If there is not some inherent power in the people of a town to tax themselves for local matters, why might not the Legislature provide that the town of Sacramento should be taxed for the local pur-

poses of San Francisco, or should build its reservoirs or
its streets? Where will you find any restriction upon the
power of a Legislature to take away from one locality all
its property and give it to another? There is a natural
justice in the people of one locality taxing themselves, and
not being taxed for the local purposes of another town,
which might be, with reason, called a right inherent in the
people.

Section twenty-one, article one, of the Constitution pro-
vides: "This enumeration of rights shall not be con-
strued to impair or deny others retained by the people."
But whether it is true, or not, that the powers of the cities,
towns and villages are powers inherent in the people, and
which still exist, except to the extent that the Legislature
has a restricted right over them, is not essential to my
argument, except to illustrate the broad distinction be-
tween local laws and general laws. This distinction is very
clear throughout the Constitution. Thus, article five, sec-
tion seven, Constitution: "He shall see that the laws
are faithfully executed." Now, here there is no duty put
upon the Governor to execute the laws passed by a city on
local matters. This power is given to the Mayor or other
head of the municipality. But, evidently, that could not
be done if an ordinance of a city were a law within the
meaning of the Constitution; for the reasons—1st. If the
power conferred upon a mayor of a city were an executive
power within the meaning of the Constitution, it could not
be delegated at all. 2d. If it could be delegated at all, it
could not be delegated by the Legislature, because the
Legislature has no right to use or delegate executive
power.

Again, too, in section seventeen, article four: "Every
bill which may have passed the Legislature shall, before it
becomes a law, be presented to the Governor; if he ap-
prove it, he shall sign it; but if not, he shall return it, with
his objections, to the house in which it originated—which
shall enter the same upon the journal, and proceed to re-
consider it. If, after such consideration, it again pass
both houses by yeas and nays by a majority of two thirds

of the members of each house present, it shall become a law, notwithstanding the Governor's objections. If any bill shall not be returned within ten days after it shall have been presented to him, Sundays excepted, the same shall be a law in like manner as if he had signed it; unless the Legislature, by such adjournment, prevent such return." Here we have a kind of law that cannot be delegated to any municipality; and yet, it is that kind of law which alone is spoken of in the Constitution. Section sixteen, article four: "Any bill may originate in either house of the Legislature, and all bills passed by one house may be amended in the other." Again, section twenty-five, article four: "Every law enacted by the Legislature shall embrace but one object, and that shall be expressed in the title; and no law shall be revised or amended by reference to its title; but in such case the act revised or section amended shall be re-enacted and published at length." Again, section thirty-one, article four: "Corporations may be formed under general laws, but shall not be created by special laws," etc. (See, also, sections 32, 34, 35, Article IV; section 12, Article VI; sections 1 and 3, Article VII; Article VIII.)

From all these sections, it is clear that those rules, properly called laws, cannot be delegated to any one, or to a corporation. But under section four, article eleven, the Legislature may establish a system of county and town governments, which shall be as nearly uniform as possible throughout the State. Hence, it follows that the Legislature may give to those governments such legislative, executive and judicial power as is necessary to regulate the local affairs of the town. It may enable the corporation to pass laws, provided their object is confined to matters interesting the inhabitants of the municipality alone. It may give the mayor power to execute these laws—thus creating a local executive. It may grant the mayor a right to be a judge, and pass judicially on questions of local matters; or it may vest the whole executive, judicial and legislative powers in one man. Evidently, in so doing, it does not delegate any of its own legislative power as given by the Constitution. It simply grants or confers new original

powers. If these powers are delegated powers, how could the Legislature be said to delegate to a mayor delegated powers, when it has no original delegated power? How can it delegate a judicial power, when it has no original executive power? How can it delegate a judicial power to a mayor, when not only it has no such power itself, but cannot itself use such power? It could not decide a judicial question. Evidently, then, these powers are no mere delegations of power; it is creating and vesting in these corporations only new original powers, which do not fall within either of the powers given to the great departments of State —the executive, judicial and legislative.

*W. H. Patterson*, also for Petitioner, cited *Parker* v. *The Commonwealth*, 6 Penn. 507; *Barto* v. *Himrod*, 8 N. Y. R. 483; *Johnson* v. *Rich*, 9 Barb. 680; *The Aurora* v. *The United States*, 7 Cranch. 582; *Stewart* v. *Jefferson*, 3 Harr. Del. R. 76, and *Gray* v. *The State of Delaware*, 2 Harr. 76. Mr. Patterson made an elaborate argument, reviewing the authorities.

*S. W. Sanderson*, for the People.

In the first place, it is said, that the law is an assault upon the rights secured by the first section of the first article of the Constitution—that it will interfere with the right of every citizen to acquire, possess, and enjoy property. I deny this. It has been denied from the commencement, till now. It will be denied in all civilized countries from now till the end of time. It is no longer an open question. It has been decided over and over—time and time out of mind. So well settled is the law in this respect, that I do not propose to review the authorities in which it has been considered, except to refer to a single case, a decision of this Court, which I shall read, because I regard it as presenting, in a very clear and satisfactory light, all the law upon this subject. I understand that no citizen of the United States has a vested right to retail intoxicating liquors by virtue of the Constitution. I understand that a law enacted under the Constitution may prohibit the retailing

of intoxicating liquors, for the same reason that it may prohibit any act upon the part of any citizen, which is vicious, noxious, or injurious to the health, to the peace, to the quiet, to the good order, to the good morals, and to the safety, happiness, and general prosperity of the community. Such a law is constitutional for the same reason that it is constitutional to prohibit the erection of slaughter-houses upon Montgomery street. It is constitutional for the same reason that a law is constitutional which prohibits the storing of gunpowder, nitro-glycerine, and other explosive materials along the line of Kearny street.

It is constitutional for the same reason that laws are constitutional which prohibit the use of combustible materials for building purposes, in large cities and towns—which convert ships into prisons for persons afflicted with contagious diseases, or send them, willing or unwilling, to the pest-house. It is constitutional for the same reason that laws are constitutional which prohibit prostitution, which prohibit gambling, which prohibit vice, in every form, which prohibit the encouragement of, or provocation to, any acts, or the toleration of any doings, upon the part of anybody, which tend, in the remotest degree, to jeopardize or impair the great ends and objects of the social compact. (*Smith* v. *Keating*, 38 Cal. 702.)

It is further said this law is repugnant to the Fourteenth Amendment to the Federal Constitution. Upon that point I shall content myself with a brief reference to a late decision by the Supreme Court of the United States.

The case to which I refer is the case of *Bartemeyer* v. *The State of Iowa*. It will be found reported in the April number of the *American Law Register*, for 1874. I read, first, from the head notes:

"The usual ordinary legislation of the States, regulating or prohibiting the sale of intoxicating liquors, raises no question under the Constitution of the United States, prior to the Fourteenth Amendment of that instrument. The right to sell intoxicating liquors is not one of the privileges and immunities of citizens of the United States, which, by that amendment, the States were forbidden to abridge."

Before taking up, if the Court please, what I consider to be the main pivotal points in this case, I propose to notice some criticisms of this law, indulged in on yesterday by the learned gentleman who opened the argument (Mr. Patterson), in regard to its force and effect in certain cases, assuming it to be a law; not because I regard them as of any constitutional consequence, or as entitled to any weight whatever, in determining the principal questions involved in this case, but because, until satisfactorily answered, they may be calculated to prejudice our minds, at the outset, against the law; whereas our minds should be free from all prejudice when we undertake the consideration of a question of this character. It was said by the learned gentleman on the other side who addressed the Court, on yesterday (Mr. Patterson), that this law prohibited the giving away of liquor in quantities less than five gallons, by persons not engaged in the liquor traffic. Upon this branch of the subject he spoke most feelingly. He regretted that if this law is to have force and effect, the sweet music of popping champagne corks will hereafter cease to be heard at social gatherings; or if heard at all, it will be at an unreasonable cost to the host, who, in order to escape the law, must give to each of his guests at least five gallons of champagne. He also said, further, that one of the effects of this law would be to prohibit executors and administrators from selling liquors belonging to the estates of their decedents, should it be necessary for the purpose of paying debts. He also said that if this law were to have force and effect it would prevent the Sheriff from seizing intoxicating liquors under any execution, and selling them in satisfaction of the debts of the judgment creditor against the debtor. He went further, and said that while the revenue laws authorized taxation to be imposed upon this kind of property, the law before the Court prevents the Tax Collector from enforcing the tax by a sale of the property.

Do all these consequences follow from this law ? I most respectfully submit that they do not. The reading adopted by counsel on the other side is not authorized by any rule of statutory construction. In the construction of a statute

we are to look to the purpose and object which the Legislature had in view in passing it. What, then, is the nature of this law? Is it a law to regulate the settlement of the estates of dead men? Is it a law for the collection of debts? Is it a law for regulating the collection of taxes? Is it a law regulating donations *inter vivos*? It is none of these, if the law is to be construed, as it must be, with some reference to the object and purpose for which it was enacted.

What, then, is the object of the law? Its object is to regulate the vending and retailing of intoxicating liquors, in quantities less than five gallons. Its object is to prevent tippling. It is aimed at a particular trade—at a particular calling—at a particular business. Its object and purpose is to regulate and control that business, and to keep it within reasonable bounds, so as not to interfere with, or injuriously affect, the general good, welfare and prosperity of society. It is in that light that we are to consider and construe it.

Is the learned gentleman upon the other side (Mr. Felton), to whom the eloquent advocate of yesterday (Mr. Patterson) referred, engaged in the business of retailing intoxicating liquors when presiding at his table? When he has a social gathering, or festive occasion, within his halls, does he stand before the law in the attitude of a man trading in intoxicating liquors? Would he be guilty of a violation of this statute if he poured a libation to his household gods, and indulged in bacchaulian festivities with his guests? When an executor or administrator proposes to sell vinous, malt or spirituous liquors, belonging to the estate of his decedent, for the purpose of paying the debts which he has left behind him, does he come before the law in the attitude of a retailer of intoxicating liquors?

When the Sheriff proceeds to seize, under execution, this species of property; and subject it to the payment of a debt, does he stand before the law in the attitude of a dealer in liquors? And so of a tax collector. This law is to receive a reasonable construction. It is to be construed so as to carry out the obvious intent and purpose of the Legislature,

in passing it. Guided by this rule, the Court will not give to it an effect which was not intended—will not enlarge, or widen its scope, but confine it strictly to the purpose or object for which it was passed. So construed, none of the consequences, so eloquently deplored by counsel, will result from the operation of this law.

It is also said that this law will inaugurate an inequality in the punishment of offenses which may be committed by persons engaged in the liquor business. I do not understand that such will be its effect. The old law upon this subject, which renders unlawful the selling of intoxicating liquors without license, and declares that a violation of its provisions shall be deemed a misdemeanor, is in no respect, in conflict with the present law; for it, too, declares that a violation of its provisions shall be a misdemeanor. There is, therefore, no conflict between the two; but if there be, the only consequence that would result from it, would be, that the old law would go down before the new, and the inequality of punishment, if any, resulting therefrom, would be such only as always exists between municipalities operating under different laws. (*People* v. *Salomon*, 51 Ill. 37; *Alcom* v. *Hammer*, 38 Miss. 652.)

It is asserted upon the part of the petitioner that this law has not been enacted by the Legislature of the State; that if it ever has any force and effect; such force and effect will be due to the will of the people, and not to the will of the Legislature; that, in short, the action of the Legislature in the premises amounts to nothing more than a delegation of the legislative power to the people of the several towns and cities of the State, and that for that reason the law is repugnant to the first section of the fourth article of the Constitution, which vests the law-making power in the Legislature.

In answer to this, we say, first, that the statute is not a delegation of legislative power, but a conditional law, or a law which is to take effect upon the happening of a future uncertain event, and therefore not repugnant to the constitutional provision in question. Second, that if the statute be construed to be a delegation of legislative power, the

power which is delegated is a part of the police power of the State, which may be constitutionally delegated by the Legislature to local, public or political corporations, such as counties, cities and towns,

I am aware that there is some color for the construction which counsel put upon this statute, to be found in the books. The cases upon which they chiefly rely are the cases of *Barto* v. *Himrod*, 8 N. Y. 486; the case of *Parker* v. *The Commonwealth*, 6 Penn. S. R. 507, and *Rice* v. *Foster*, 4 Harrington, 492. The first of these cases involved the constitutionality of the general school law of the State of New York, and it was held that the law was unconstitutional, for the reason that it was a delegation of the legislative power, and not a conditional law. The second involved the constitutionality of a local option liquor law, which was held to be unconstitutional for the same reason. The last case also involved the constitutionality of a local option liquor law, and it was held to be unconstitutional for the same reason. In all of these cases, statutes seem to have been framed for the express purpose of being submitted to the people, in the nature of a draft, for their indorsement or rejection. Thus, the statute considered in the case of *Barto* v. *Himrod*, contained the following section:

"Sec. 10. The electors shall determine, by ballot, at the annual election to be held in November next, whether this Act shall or shall not become a law."

In this language the Supreme Court of New York found some justification for the conclusion they reached, for the Legislature seemed thereby to abdicate its office and turn it over to the people; and, if the statute in hand admits of no other construction, it might fall within the rule laid down in *Barto* v. *Himrod*. But, we respectfully submit, that by no fair rule of construction can this statute be held to be other than a conditional law. It was claimed in *Barto* v. *Himrod*, that the statute then before the Court was also a conditional law, but the Court held that it was not, for the reason that the result of the popular vote is not an event in view of which the Legislature can constitutionally provide that a law shall or shall not take effect.

It was said, with truth, that the event or chain of circumstances on which a law may be made to take effect, must be such as, in the judgment of the Legislature, affects the question of the expediency of the law; an event on which the expediency of the law, in the judgment of the law-makers, depends. On this question of expediency, the Legislature must exercise its own judgment, definitively and finally. When a law is made to take effect upon the happening of such an event, the Legislature, in effect, declares the law inexpedient, if the event should not happen; but expedient, if it should happen. They appeal to no other man, or men, to judge for them in relation to its present or future expediency. They exercise that power themselves, and then perform the duty which the Constitution imposes upon them. Substantially the same views were taken in the other two cases of *Parker* v. *The Commonwealth*, and *Rice* v. *Foster*.

Whether this reasoning be sound is the question upon which the solution of this case, so far as the present point is concerned, must depend. The distinction which was there attempted to be drawn, between the result of a popular election and any other future uncertain event, is without any foundation in the Constitution, or in reason. The idea that laws that are made to take effect upon the result of a popular vote, amount to a delegation of legislative power, is founded upon a false theory as to the true source and nature of the tenure by which the Legislature exercises and holds its power. The argument proceeds upon the theory that legislative power is derivative, and cannot, therefore, be exercised by anybody except the Legislature itself. It assumes that the constitution is a mere letter of attorney, emanating from the people to the different departments of the government, authorizing them to perform or exercise certain governmental functions. I submit that the supposed analogy is false. I submit that there is not the slightest resemblance between the relation existing between the Legislature and the people, and the relation that exists between a principal and his agent. What is the Constitution? It is declared, on the other side, to be a mere letter

of attorney.    On our ·side it is respectfully submitted that
it is the fundamental law.    It is a law unto the people as
well as unto the government.    It is the corner stone; the
foundation, of the whole social fabric.    Upon it stand, not
only the three departments of the government, but also the
'people.    The Constitution, it is true, in a certain sense,
comes from the people.    In a certain sense, it is begotten
by them, but it comes from them like Pallas from the cleft
brain of Jupiter, a new being, perfect in its individuality,
with a mind and will of its own.

While the · Legislature is, in a certain sense, the creature
of the Constitution, yet it does not so much take its power
from the Constitution as from the nature of its own exist-
ence.    Plenary legislative power is by the nature of the
case inherent in all State legislative bodies, and when the
Constitution declares that all legislative power shall be
vested in the Legislature, it only declares an universal,
self-evident truth—it merely declares that the Legislature
shall be the Legislature.    It grants no power.    It assumes
that the power exists inherently, and then proceeds to re-
strict its exercise.    Hence, in respect to the power of the
Legislature, there is no principal standing behind the Con-
stitution.    The Constitution is itself the principal.    There
is no higher power—no. higher law·—by which the exercise
of legislative power is to be governed.    These principles
were lost sight of, or ignored, by the Courts, when they
undertook to say, as a matter of Constitutional law, upon
what future, uncertain events, and what not, the Legislature
might provide that a conditional law should take effect.
That there is no provision in the Constitution which pro-
hibits the passage of conditional laws, is admitted.    It is
equally true that the Constitution is silent as to what event
may or may not be chosen by the Legislature as the event
upon which a conditional law may take effect.    It may be
conceded that in passing laws Legislatures should exercise
their judgment upon the question of their expediency, but
it is the universal rule that the expediency of laws may de-
pend, in the judgment of the Legislature, upon the condi-
tions that may exist in society, and the views that may be

entertained of the law itself by the people upon whom it is to act; and there is nothing in the Constitution which prohibits the Legislature from taking such means as they see proper for the purpose of ascertaining what such conditions and views may be. It may resort to any sources of information. It may call the people together to express their views in relation to the expediency of a law; as to whether the necessities of the people demand it, or as to whether the popular sentiment is such as to admit of its enforcement. So long as it is the duty of the Legislature, which everybody admits, to enact laws which are suited to the conditions and wishes of the people, it must and ought to be competent for the Legislature to adopt such measures as they may deem proper for the purpose of ascertaining what are the wants and wishes of the people. No one will pretend but that the Legislature may enlighten its own understanding, with reference to the expediency of a law, by submitting the question of its expediency to a popular vote in advance of its passage. Suppose the law now before the Court, or rather the principle on which it is founded—Local Option—had been first submitted to the people, and approved by them, and, upon such approval, this law had been passed, no one could be found so bold as to have questioned its validity. If this be so, why may not the Legislature prepare a law and pass it through the forms of legislation and submit the question of its expediency or approval afterwards to a popular vote? I submit that there is no distinction to be drawn between the two cases; hence, if the first be a constitutional exercise of the legislative power the last must be, by parity of reason.

It would seem to be obvious that if nothing can be found in the Constitution restricting the choice of the Legislature, as to future uncertain events upon which a law shall be made to take effect, it does not lie in the mouth of the Courts to say whether a given event is a, constitutional one or not. (*Hobart* v. *Supervisors of Butte Co.*, 17 Cal. 30; *Blanding* v. *Burr*, 13 Cal. 358; *State* v. *Parker*, 26 Vermont, 365.)

In the State of New Jersey, a Local Option law, sub-

stantially the same as that now before the Court, has been
passed and is now in force.    In that State, as in this, the
validity of the law was most vigorously contested.    The
question was taken to the Supreme Court of the State; and
determined in favor of the validity of the law, in the case
of *The State* v. *Morris Common Pleas*, reported in the 12th
American Law Register, at page thirty-six.    In that case
the Court, while conceding to the fullest extent the doc-
trine that legislative power could not be delegated, except
as to the police powers of the State, held that the law was
not a delegation of legislative power, but a conditional
law, and that its validity, as a conditional law, was wholly
unaffected by the fact that a popular vote, instead of some
other uncertain event, had been made the contingency
upon which it was to take effect.

In the State of Indiana, Local Option Railroad Subscrip-
tion laws were held to be constitutional, but Local Option
Liquor laws were held to be unconstitutional.    In the case
of *Maize* v. *The State*, (4 Ind. 344,) while it was unneces-
sary in determining the case to decide whether a law
could be made to take effect according to the result of
a popular vote, for the reason that the Constitution of
that State seems to prohibit the passage of any law to take
effect by the will of third parties, yet the Court consid-
ered the question, and held that a conditional law could
not be made to depend upon the result of a popular elec-
tion.    But the Supreme Court of that State has followed
the example, so worthily set it by the Supreme Court of
the State of Pennsylvania, and has changed front, in logical
effect, though not, perhaps, in express terms, upon the
question of Local Option Liquor laws.    Since the decision
of the Supreme Court in the case of *Maize* v. *The State*,
declaring the Local Option Liquor law then in force in
Indiana unconstitutional, the Legislature of that State have
passed an Act differing from the first, so far as the present
question is concerned, only in the circumstance that in-
stead of referring the question of license or no license, to a
popular vote, it required that every applicant applying for
a license, should present a written petition, signed by a

majority of the legal voters of the town or city, as the case might be. It is very certain that this last law cannot be distinguished from the first; or if it can, it is a distinction without a difference (so far as the question under consideration is concerned,) whether the law is to take effect upon the happening of a majority vote or a majority petition; for in the one case the result is as much controlled by the popular will as in the other case, the only difference being as to the manner or mode provided for ascertaining what is the will of the people. The constitutionality of this latter law came before the Supreme Court of the State, in the very recent case of *Groesch* v. *The State*, reported in 42 Indiana Reports, (p. 547.) The validity of the law was assailed by counsel, upon the same grounds now urged before this Court. It was claimed that it amounted to a delegation of legislative power; that it provided for a direct intervention of the people in making and in executing the law, and that its force and effect were dependent upon popular choice.

The Local Option law of this State was passed by the Legislature, according to all the forms of legislation. It was made to take effect from and after its passage. It provided, not that the law should take effect, according as the people might or might not vote for or against license, but that it should take effect from and after its passage. It was perfect and complete when it left the halls of legislalation. The people might act under it, but they could not add to it, or take from it a line or syllable. Instead of the vote of the people giving force and effect to the law, in a legislative sense, it was but one of the acts for which the law itself provided. In voting, the people do not exercise legislative power, but perform an act required by the Legislature, in the execution of the law.

As was said by this Court, in the case of *Robinson* v. *Bidwell*, (22 Cal. 379): "The popular vote is not the act of legislation, but simply an event upon the happening of which the law is to take effect."

As was said by the Supreme Court of Michigan, in the case of the *People* v. *Collins* (3 Mich. 360): "The law does

not take effect by force and effect of the popular vote, but by force and effect of the same will which authorizes the vote as a pre-declared and pre-determined consequence of it."

In the State of Illinois, in the case of *The People* v. *Reynolds*, (10 Ill. 1), the whole question of Local Option laws was most thoroughly, elaborately and satisfactorily discussed.

The question before the Court was, the constitutionality of a law providing for the division of a county, and the formation of a new county from the same territory, to take effect on a majority of the votes in the county being cast for such a division. The Court held the law to be constitutional, and in discussing the question reviewed all the cases to which I have referred, as opposed to the Local Option principle, and expressed the opinion that they found no support in the Constitution of any of the States in which they arose.

It was held that such laws were valid, whether considered as conditional laws, or laws delegating to the people of subordinate municipal corporations, a part of the police power of the State.

In the State of New Hampshire, a Local Option law in relation to the licensing of billiard saloons and bowling alleys, has been held to be constitutional by the Supreme Court. The law, like the Local Option Liquor law of this State, imposed penalties for a violation of its provisions. It does not, therefore, differ upon principle, or in material circumstance, from the law of this State; and if the former be constitutional, by a parity of reason, the latter must be.

In the State of Massachusetts, a former statute provided that no person should manufacture or sell any intoxicating liquors, unless authorized as provided therein, and declared that ale, porter, strong beer and lager beer, and all wines, should be considered intoxicating within the meaning of the act, as well as distilled spirits. The law was afterwards amended by striking out the words ale, porter, strong beer and lager beer, and provided that any person might manufacture or sell, or keep for sale, these liquors,

but that the inhabitants of any city or town might annually vote that no person should be allowed to sell them, in which case the sale of such liquors in such city or town, should be prohibited.

Your Honors will readily perceive that the conditions which exist in this State, so far as legal principles are concerned, are almost identical with those existing in the State of Massachusetts. Prior to the passage of the Local Option law of this State, we had a law prohibiting the sale of intoxicating liquors without a license, under certain penalties therein provided. for. Under this law, any one was entitled to a license to sell liquors, upon payment of a license tax as therein provided. Then came the Local. Option law, which supplements the old, and provides that no license to sell liquors in less quantities than five gallons, shall be granted, if the people of the town, city or township shall, by a majority, vote against license. In the Massachusetts case referred to, the Massachusetts law was held to be constitutional, and if it be constitutional, by parity of reason, the Local Option law of this State is also constitutional.

In the State of Iowa, a Local Option Fence law, providing that stock should be allowed to run at large or not, according as a majority of the people might vote upon the question, came before the Supreme Court of the State upon the question whether it was constitutional or not, and it was decided in the case of *Dalby* v. *Wolfe and Palmer*, (14 Iowa, 288,) that the law was constitutional. It was claimed that the law was unconstitutional because it was made to depend upon the popular will for force and effect.

It is a mistaken idea, if the Court please, that the Local Option law of this State in relation to the vending of intoxicating liquors, is a new or novel feature in the legislative history of the country. It is true it differs from former laws upon the subject, in circumstances, but not in principle. In the license laws of Vermont, New Hampshire, Massachusetts, New Jersey and Pennsylvania, and perhaps other States, which existed prior to the adoption of the

Local Option principle, the power to grant licenses was con-
fided to Selectmen, to Municipal Councils, to County Courts,
and Boards of Excise. In some cases, full power was given
over the question, and these bodies could, in their discre-
tion, grant licenses or refuse them. In other cases, the dis-
cretion was not full, and the licensing bodies were required
to grant licenses upon condition that the applicants were ap-
probated by a certain number of freeholders, ranging from
twelve to twenty. In all of these cases, if the Court please,
there was a delegation of legislative power, if such it is to
be called, as perfect and complete, in all respects, as under
the Local Option law of this State; the only difference be-
ing, that the question of license was acted upon by Select-
men, Town Councils, County Courts and Boards of Excise,
while, under the law of this State, the question of license
or no license is submitted to a majority of the people.
None of the laws referred to were ever supposed to be un-
constitutional. No lawyer of those days was bold enough to
question their validity. It was only when the people were
intrusted with power over the subject that the question of
the validity of such laws began to be agitated; and it is a
little surprising that, under a representative form of govern-
ment, which is founded upon the will and consent of the
people, any one could be found bold enough to question
the right of the people to be consulted as to the laws by
which they are to be governed. It is surprising, that while
it was admitted that conditional laws were constitutional
when made to depend for their force and effect upon the
action of third persons, any one could be found willing
to declare that the people should not constitute such third
persons. That they should, would seem to be the most con-
sistent with the forms of popular government.

While, may it please the Court, we have found some con-
flict of authority as to the validity of Local Option
Liquor laws, we find no conflict of authority as to the valid-
ity of Local Option laws upon other subjects. It is
true there was a ripple, a few years ago, in Wisconsin, in
relation to the validity of railroad subscription and subsidy
laws, but it soon subsided, and the rule has now become

universal, that Local Option laws in relation to railroad subsidies, to the removal of county seats, to the erection of public buildings, such as court-houses and school-houses, and a variety of other matters, are constitutional. Such is the rule everywhere, from Maine to Texas, from Oregon to Florida. No other State has gone further than this, in upholding Local Option laws. From the commencement of the government down to the present time, Local Option laws, in one form or other, have existed, and still exist, in this State.

Look at the long array of railroad subsidy laws; to the school law, which submits the erection of school-houses, and the levying of a tax therefor, to the people of the school district. Look at the statute which provides that the people of the several counties of the State may change the location of their county seats, from time to time, by a popular vote. Look at the law, which has been upon the statute book of this State from the earliest time, which provides that the trial of the right to mining claims shall be governed by the rules and regulations adopted, and in force, in the district in which the claim is situated. Here we find our first California Local Option law. Here the Legislature said to the miners of every mining district in the State: "Adopt your own rules, your own regulations; and the rules and regulations so adopted shall constitute the law by which your rights shall be determined, by which your tenure to your mining claims shall be adjudged." That law has come before this Court, at nearly every term, from the time of its passage to the present. No one ever had the hardihood to question its constitutionality.

It is respectfully submitted that these laws cannot be distinguished, on the score of principle, from the law under consideration; and if this law is to be overturned, for the reasons urged against it, all the other Local Option laws of the State must fall with it.

With these remarks, I leave this branch of my argument. (*State* v. *Paul*, 5 R. I. 185; *State* v. *Kerran*, 5 R. I. 497.)

Our next position, may it please the Court, is, that if the law in question be a delegation of legislative power, the

power delegated is a part of the police power of the State, which may be constitutionally delegated by the Legislature to local, public, or political corporations, such as counties, cities and towns. While it may not be necessary, for the purposes of this case, to question the truth of the general proposition that legislative power cannot be delegated, I do not desire to be understood to accede to it in any degree. In those cases in which the doctrine that legislative power cannot be delegated has been enunciated and sustained, it is not contended that there is any express provision in the Constitution. The argument rests, in part, upon a supposed implication, arising out of the fact that all legislative power is vested, primarily, in the Legislature, and, in part upon the idea that every Constitution has a genius, or a spirit, which Courts are at liberty to consult in cases where the letter of the Constitution is silent.

It may be regarded as now well settled, that the Courts must find all restrictions upon the exercise of legislative power, in the letter of the Constitution, and such necessary implications as arise therefrom. It would be a dangerous doctrine to establish, that every judge is at liberty to declare a law constitutional or unconstitutional, in accordance with his own notions as to what constitutes the genius and spirit of the Constitution. While such is the case, State Constitutions would become protean in form, would take different shapes, from time to time, according to the notions of their genius and spirit entertained by the Court interpreting them.

So far as the argument against the delegation of legislative power rests upon a supposed implication, arising out of the fact that all legislative power is vested in the Legislature, if it proves anything, it proves too much.

The supposed implication certainly affects all legislative power, if it affects any; and, if the argument is sound, it must establish, conclusively, the proposition that, under no circumstances, can any of the legislative power be delegated to third persons; and if it turn out on examination that this argument is unfounded in part, it must result that the implication does not exist. As

was remarked by Judge BALDWIN, in the case of *Hobart*
v. *The Supervisors of Butte County*, the Legislature being in
possession of a great mass of political powers, may exercise
them in any manner they see proper, unless restrained by
some express provision or necessary implication of the Con-
stitution.  If an implication be relied on, as prohibiting a
given Act of the Legislature, it must stand out clear and
well-defined.  This cannot be asserted of the supposed im-
plication question.  It is inconsistent with the practice of
all civilized governments, from time immemorial down to
the present day.  In England, the government granted
legislative powers to the East and West Indian Colonies.
It did the same with her American Colonies, which have
since grown up and expanded into these United States.
Holland, France and Spain have done the same, and even
the government of the United States itself has delegated
powers; has, from the commencement, governed the people
of its territories, by creating for them a form of government
under what is denominated an Organic Act, and vested the
departments thereof with legislative, judicial and executive
powers.  It may be said, upon the other side, that these
grants of legislative power, from England, France and
Spain, to their colonies, came from the crown, not from
the law-making department of the government; and that
these illustrations, therefore, are inapt, and prove too
much.  It is true, may it please your Honors, that they did
come from the crown, and not from the law-making de-
partment; but we are to remember that under our form of
government all the legislative powers of the crown and of
Parliament are combined and vested in the Legislature, and
the Constitution creates no distinction as between the two.
Whatever the king could have done, or can do, in England,
in the way of granting charters, franchises and govern-
mental powers, the Legislature may do, upon the same
terms and conditions upon which it exercises all its other
powers.

There is a well-defined class of legislative powers called
Police Regulations, which, so far as I have been able to
discover, the right of the Legislature to delegate, no one

has ever denied.   The powers to which I refer are those
which are uniformly conferred upon subordinate local gov-
ernments;   such as counties, towns and cities.   They in-
clude the power to construct, repair and improve highways,
to abate nuisances, to preserve order and quietness, to re-
press houses of ill fame, gambling and tippling shops.
This law, if the Court please, falls clearly within this class
of powers, and should your honors declare it to be a plain
and palpable delegation of legislative power, it is, neverthe-
less, constitutional.   Instead of the Constitution forbid-
ding the delegation of police powers to local public corpo-
rations, it requires such corporations to be created by the
Legislature, and the act of creation of necessity includes
the delegation of such legislative powers as are generally
included or classed as police powers.   These powers may
be delegated to the governing bodies of counties, cities or
towns, or to the people at large, to be exercised in their
discretion, or upon such terms and conditions as the Legis-
lature may prescribe.   From time out of mind, the power
to regulate the sale of intoxicating liquors has been dele-
gated to public corporations, to Commissioners, Selectmen
and Boards of Excise; and, if it may be delegated to them,
it may be delegated to the people at large; for, the right to
delegate being conceded, there is certainly no constitutional
restriction requiring it to be granted to governing bodies,
rather than the people at large.    (*The Commonwealth* v.
*Bennett*, 108 Mass. 29; *Clark* v. *The City of Rochester*, 28 N.
Y. 605.)

Here, if the Court please, I close my argument; but in
doing so the great importance of the question and the grave
interest taken by the people in it justify me, if justification
be necessary, in recalling to your Honors' attention the
rules which are to be followed in the solution of all consti-
tutional questions.   That this law is a popular law; that is
to say, that it meets with the approval of the people of the
State, is manifested by the fact, as I am informed, that out
of over a hundred elections which have been held under it,
those elections have gone in favor of the law, in the ratio
of two and a half to one.   It was said by Chatham, I think,

when explaining a vote which he was about to give in favor of the passage of a law: "I shall vote for this law for three reasons: 1st. Because the people demand it; 2d. Because the people demand it; and, 3d. Because the people demand it."

He considered the popularity of the law as a sufficient test of its merit. Were this Court unfettered by constitutional restrictions, it might well say, in the language of Chatham, "We will sustain this law, because the people demand it." So, if the Court please, it well becomes us to refer, as already suggested, to the rule governing the consideration of constitutional questions. I understand the rule to be this, and I understand that there is no difference of opinion in regard to it—that Courts must always sustain the validity of a law, unless it violates some provision of the Constitution, plainly, palpably and beyond all reasonable doubt. In other words, every reasonable doubt as to its validity must be resolved in favor of the law. Chief Justice BLACK, one of the most eminent of American Judges, in that clear, terse and pointed manner for which he was remarkable, in the great case of *Sharpless* v. *The Mayor, etc.* (9 Harris, 164), thus declares the rule:

"We can declare an Act of the Assembly void only when it violates the Constitution clearly, palpably, plainly, and in such a manner as to leave no doubt or hesitation in our minds."

I have often thought, may it please your Honors, that there ought to be inserted in every Constitution a provision that no law of the Legislature should be overturned or declared null and void by any Court, except upon the unanimous concurrence of all its members. It is a most delicate thing for a Court to undertake to override the will of a coördinate branch of the government. Nowhere, except in America, is such power conferred upon the Judiciary. We look in vain through the judicial decisions of England for any discussion of constitutional law. Parliament is the sole judge of what is the Constitution of England.

While the rule is otherwise in America, it should never be forgotten that the Judiciary Committees of our legis-

lative bodies are composed, in a great measure, of lawyers, sometimes as eminent, and even more so, than those who preside in our Courts, and that their opinion of the constitutionality of the law is entitled to great weight.

I have often thought that the opinion of the Legislature has not always received the consideration to which it was entitled; and when, as is frequently the case, a Court is divided upon the constitutionality of the law, a bare majority being opposed to the law, a reasonable doubt may be said to exist, and the judgment of the Legislature should be allowed to turn the scale the other way.

*L. Baldwin*, also for the People, reviewed the authorities cited by counsel, in an elaborate argument.

By the Court, McKinstry, J.:

Under the Act of March, 18, 1874, "To permit the voters of every township or incorporated city to vote on the question of granting licenses to sell intoxicating liquors," an election was held in the Fourth Township of Contra Costa County, at which a majority of the votes were cast "against license."

The petitioner was afterward convicted of an alleged violation of the law, as declared by the statute, and sentenced to imprisonment in the county jail.

The power to make laws conferred by the Constitution on the Legislature cannot be delegated by the Legislature to the people of the State, or to any portion of the people. (*Houghton* v. *Austin*, 47 Cal. 646; *Barto* v. *Himrod*, 8 N. Y. 483; *Bank of Rome* v. *Village of Rome*, 18 N. Y. 38; *Starin* v. *The Town of Genoa*, 23 N. Y. 429; *Clark* v. *The City of Rochester*, 28 N. Y. 605; *Thorn* v. *Cramer*, 15 Barb. 112; *Bradley* v. *Baxter*, Id. 122; *Parker* v. *Commonwealth*, 6 Penn. St. 507; *Commonwealth* v. *Quarter Sessions*, 8 Penn. St. 391; *Locke's Appeal*, 72 Penn. St. 491; *State* v. *Wilcox*, 45 Mo. 459; *Rice* v. *Foster*, 4 Harr. 479; *State* v. *Copeland*, 3 R. I. 33; *R. R. Co.* v. *Commissioners of Clinton County*, 1 Ohio, N. S. 77; *People* v. *Collins*, 3 Mich. 343; *Santo* v. *State*, 2 Iowa, (Clarke) 165; *Geebrick* v. *State*, 5 Iowa, 491;

*State* v. *Beneke,* 9 Iowa, 203; *State* v. *Weir,* 33 Iowa, 134; *Maize* v. *State,* 4 Ind. 342; *Meshmeier* v. *State,* 11 Ind. 482; *State* v. *Swisher,* 17 Tex. 441; *State* v. *Panker,* 26 Vt. 362.)

Our government is a representative republic, not a simple democracy. Whenever it shall be transformed into the latter—as we are taught by the examples of history— the tyranny of a changeable majority will soon drive honest men to seek refuge beneath the despotism of a single ruler. To become a law, an act must be passed through both Houses of the Legislature, be signed by the President of the Senate, and Speaker of the Assembly, and be approved by the Governor; or, if vetoed by the Executive, must again be passed by the constitutional majority. Thus, and thus only, can a general statute be enacted.

While the power and responsibility of legislation remain where the Constitution has placed them, a proposed measure, before it can become a law, must pass through the ordeal of a public and deliberate discussion in the Legislature. "Public opinion will prevail; but it will be enlightened, deliberate, permanent, and organically expressed public opinion. It is this opinion alone which the Constitution designed should govern. Such a government secures deliberation and responsibility in legislation, and affords protection against the despotism of official rulers on the one hand, and of irresponsible numerical majorities on the other. It has been appropriately termed ' the flower of modern civilization.' " .(*People* v. *Collins,* 3 Mich. 416.)

It is urged, however, that for the Legislature to enact that a law shall take effect, provided the people of the State, or of a district, shall vote in favor of it, is not to delegate the law-making power. This position has been upheld by Courts of high character, but I think the decisions in which it has been denied are sustained by the better reasons.

It is true a statute may be conditional; its taking effect may sometimes be made to depend upon a subsequent event. The last proposition is illustrated by the case of *The Cargo of the Brig Aurora* v. *United States,* 7 Cranch 382, in which the validity of a provision of the "non-inter-

course law" was upheld. The provision was to the effect that in case Great Britain or France should revoke or modify its edicts previously issued, so that they should cease to violate the neutral commerce of the United States, the trade suspended by the law should be renewed. It will be observed that in this instance the members of Congress exercised their own judgment, and simply determined that trade should be suspended, while the orders in council or edicts should continue.

But it does not follow that a statute may be made to take effect upon the happening of any subsequent event which may be named in it. The event must be one which shall produce such a change of circumstances as that the lawmakers—in the exercise of their own judgment—can declare it to be wise and expedient that the law shall take effect when the event shall occur. The Legislature cannot transfer to others the responsibility of deciding what legislation is expedient and proper, with reference either to present conditions or future contingencies. To say that the legislators may deem a law to be expedient, provided the people shall deem it expedient, is to suggest an abandonment of the legislative function by those to whose wisdom and patriotism the Constitution has intrusted the prerogative of determining whether a law is or is not expedient. Can it be said in such case that any member of the Legislature declares the prohibition or enactment to be expedient?

A statute to take effect upon a subsequent event, when it comes from the hands of the Legislature, must be a law *in presenti* to take effect *in futuro*. On the question of the expediency of the law, the Legislature must exercise its own judgment definitely and finally. If it can be made to take effect on the occurrence of an event, the Legislature must declare the law expedient if the event shall happen, but inexpedient if it shall not happen. They can appeal to no other man or men to judge for them in relation to its present or future propriety or necessity; they must exercise that power themselves, and thus perform the duty imposed upon them by the Constitution. But in case of a law to take effect, if it shall be approved by a popular vote, no

event affecting the expediency of the law is expected to happen. The expediency or wisdom of the law, abstractly considered, does not depend on a vote of the people. If it is unwise before the vote is taken, it is equally unwise afterward. The Legislature has no more right to refer such a question to the whole people than to a single individual. The people are sovereign, but their sovereignty must be exercised in the mode pointed out by the Constitution. (*Barto* v. *Himrod*, 8 N. Y. 483; *Rice* v. *Foster*, 4 Harr. 479.)

It was argued that the general statute which prohibits the sale of intoxicating liquors without license and the "Local Option" statute should be read as one law, and so reading them, that it is not left to the popular vote to give effect to the law, but only to determine whether licenses shall be issued under the law. This distinction seems to have been recognized by the Supreme Court of New Jersey in *State* v. *Morris Common Pleas*, (November, 1872.) There a statute was sustained which, in itself, contained a prohibition of sales without license, and then left to the people in town meeting, to say whether licenses should be granted. The Supreme Court of that State, after stating the test to be whether the enactment, when it passed from the hands of the law-givers, had taken the form of a complete law, said: " It (the statute), denounces as a misdemeanor, the selling of liquor without license; so far it is positive and free from any contingency; it is left to the popular vote to determine; not whether it should be lawful to sell without license, but whether the contingency should arise under which licenses should be granted." The New Jersey statute left the option whether licenses should or should not be granted to the people in "town meeting." The difference between the action of towns, as local governments, and a submission to the voters living in any merely territorial subdivision of a county, will be hereinafter pointed out. I do not think, however, that the distinction asserted by the Supreme Court of New Jersey, can be maintained. A law being in operation authorizing the business of retailing liquors, provided a license be first obtained, the Legisla-

ture enacts that the people of a town shall determine whether any license shall be granted. If they determine that licenses shall not be granted, none can be issued.

It is plain in such case that the law-makers do not intend to establish the new rule, until it shall have other sanction and allowance than that of the Legislature itself. Licenses were granted by authority of the old law; they can be prohibited only by a new law. But in the case supposed, the Legislature does not determine that licenses shall not be granted, but leaves it to the popular vote to determine the very contingency which the Legislature must determine for themselves, in order to give effect to the law.

It is certain that the sections of the General Revenue law relating to licenses to vendors of liquors, remain in force until the vote is counted and announced, as required by the statute; it is equally certain (if the statute is valid,) that these sections cease to have force from the time the vote is announced, if the majority is against license. By whom, in such case, are the provisions of the Revenue law repealed or suspended—by the Legislature or by the people of the town?

And we are thus brought to another question: Can this law be sustained as in effect conferring on "towns" the power of regulating within their limits the sale of intoxicating liquors?

In determining this question, I do not deem it necessary to decide any of the following:

1. Can the officers of a city or town be empowered to regulate the sale of intoxicating liquors; and, if so, can they prohibit the sale in certain quantities under the power to regulate it?

2. Can a city or town by ordinance or by-law, make that a criminal offense which is legalized by the general laws of the State?

3. Does an Act of the Legislature authorizing a by-law, the effect of which is to relieve those making sales of more than five gallons, within the town, from the payment of a license-tax, which those engaged in the same business out-

side of the town are obliged to pay, violate the provision of the Constitution: " All laws of a general nature must have a uniform operation ?"

4. Would a law be unconstitutional which conferred a power upon the officers of a county or town, to be exercised at the option of the officers, provided the people of the county or town should vote in favor of the exercise of the power by the officers ?

It is enough to say that this statute cannot be sustained as conferring on the towns the power referred to, because no "towns" have ever been created in this State.

Our Constitution, in terms, makes it the imperative duty of the Legislature to create certain local governments. " The Legislature shall establish a system of county and town governments, which shall be as nearly uniform as practicable throughout the State." (Art. XI. Sec. 4.) " It shall be the duty of the Legislature to provide for the organization of cities and incorporated villages," etc. (Art. IV, Sec. 37.) The behest of the Constitution as to "towns" will be obeyed when a system of town governments shall be established by law. When the system shall be established, the towns may make such local rules or by-laws as they shall be authorized to make by the statutes which shall give them life and entity. The bestowal on them of the power to make proper local rules or by-laws, will not be a delegation of legislative power conferred on the Senate and Assembly, because, as was said in *Hougton* v. *Austin*, *supra*, the exercise of such power by the counties, towns, cities and incorporated villages, is recognized by the same Constitution which confers the general legislative power upon the State Legislature.

But the Constitution is not self-executing; the town governments must be created by statute. And it will be observed, the Constitution commands the Legislature to establish a system of town governments. This form of expression conveyed a definite meaning, when the Constitution was adopted, and is at once understood by those familiar with the systems of town government elsewhere; it would be meaningless, unless applied with reference to

organizations, in their general features at least, like those in other States, where systems of town government had been established. To establish a system of government, the duties of the several local officials must be defined, in some of whom (or in the inhabitants of the town acting in a public capacity) a discretionary action must be vested within the scope of the powers given by the organic law which creates the system. In view of the origin of towns and their history in other States, I can conceive of no system of town government which is not continuous; which does not furnish officers to whom is given (during their term of office) the management of the machinery of local government, and which does not provide a legislative assembly, whose enactments shall be the product of deliberation and mutual consultation. This last seems the very life of any such system heretofore known in the United States. If the subjects of local legislation are committed to the people of the town, they must be committed to them as to a deliberative body; a project for a local regulation must be submitted to the wisdom and discretion of the people in organized assembly, by whom, after proper discussion and consideration, it may be rejected, or molded into a rule to be enforced as law. In our country, the idea of legislation —in its broader sense, or as applied to local concerns—involves an examination into the merits of a proposed law by the assembled legislators. Under the system of town governments in New England, it has been the practice (by notice designating the questions to be presented), for the Selectmen to call meetings of the voters of the town—which are presided over by a moderator, and restrained by rules intended to secure orderly proceedings—at which the propriety and expediency of proposed measures may be considered, adopted or rejected. The voters of the town are supposed to be so few in number, that they may act directly on matters of local concern, but they act as a subordinate, legislative and deliberative body, in every sense that their representatives would so act, if representatives were selected by them. The matters of local interest are discussed in the town meeting, before they are passed upon.

---

---

"The marked and characteristic distinction," says Chief Justice SHAW, in *Warren* v. *Charlestown*, "between a town organization and that of a city is, that in the former all the qualified voters meet, deliberate, act and vote; whereas, under a city government, this is all done by their representatives." (2 Gray, 84–101.) Mr. Quincy, in his "Municipal History of Boston" (p. 28), in explaining the causes which led to the establishment of a city government for Boston, while he proves that the town government had outlived its usefulness, shows that before the city was incorporated all the qualified electors constituted the local Legislature. He says: "With a population upwards of forty thousand, and with seven thousand qualified voters, it was evidently impossible calmly to deliberate and act. When a town meeting was held on any exciting subject in Faneuil Hall, those only who obtained places near the moderator could even hear the discussion."

The system of town governments, as it existed in New York prior to 1846, is fully explained in the eleventh chapter of the first part of the revised statutes of 1827-8. There, as in New England, the towns possessed certain of the faculties of a body corporate; could sue and be sued, hold lands and make contracts necessary to the exercise of their corporate powers. In New York, as elsewhere, the citizens of towns chose certain town officers, and when assembled as a deliberative body (Justices of the Peace presiding), made "prudential rules and regulations," with respect to local matters committed to their discretion. In some other States this power would seem to have been vested in Boards of Trustees, who constituted the local parliaments.

The Legislature of California has never established a "system of town governments." The word "town" is nowhere used in the statutes in the sense in which it is employed in the Constitution. The Supervisors are authorized (Political Code, Sec. 4,046) to divide the counties into "townships," as they are authorized to divide them into election, school, road, and supervisorial districts; but the territory included in any one of the districts last named

need not be the same as that included within the limits of a township. No township governments have been established. The only officers mentioned in the general laws as township officers are Justices of the Peace and Constables. The townships have neither been given personality nor any other of the attributes of a corporation; no official has been named empowered to call the inhabitants or voters together for the purposes of consultation and joint action; no Act has been passed providing for any presiding officer, or regulating the mode of conducting business, or of declaring the result of the action of the inhabitants or voters when assembled; and neither the voters themselves, nor any boards of officers elected by the voters have ever been constituted a deliberative assembly for the purpose of adopting prudential rules or regulations in respect to matters placed under the control of the town governments.

The exercise by the town governments, when they shall be established, of the power to make local rules will co-exist with the power of the State Legislature to make general laws, and will apparently (but apparently only) constitute an exception to the rule, that the power to make laws, placed by the Constitution in the Senate and Assembly cannot be delegated. When the mandate of the Constitution shall have been obeyed, and a " system of town governments " shall have been established, and when local legislatures shall have been organized under that system, the State Legislature may confide to members of such local legislatures the task of deliberating and acting upon matters purely local in their nature. The Legislature may give to the town governments, when formed, the right to make local rules; but the Legislature has no more right to delegate to the people living within certain territorial limits, but who have no distinctive political character or governmental organization, the power to make laws, than it can delegate the same power to all the people of the State.

The statute of March 18, 1874, under the provisions of which the petitioner was convicted, does not itself establish any system of town government. The only officers who are

directed to perform any acts are county officers; the election is to be ordered by and the returns made to the Supervisors. There is no provision for an assemblage of the people of the town for deliberation; the vote to be taken can in no way be said to express the result of such deliberation. The Constitution intended that the opinion of a majority should govern as to town matters, but that it should be an "organically expressed" opinion. The power to enact laws must be employed by the State Legislature; that to make by-laws for a town by the local Legislature; to become law or by-law, it must first be considered by the appropriate deliberative body. The statute under consideration simply permits a species of *plebiscitum* with reference to a particular subject, in which the only option of the people of a township is to say "yes" or "no" to a complicated project. After this spasmodic effort at the polls, the "town government" (if this can be called one) subsides into inaction, without any form or power of self-vitalization, until again aroused to the exertion of its single function by the Supervisors of the county. This statute furnishes neither a system nor a government.

When M. de Tocqueville and other writers, who have studied our institutions in a philosophical spirit, have expressed their admiration for the system of town governments existing in New England, as affording an excellent school of preparation for the discharge by the citizen of his duties to the State, it was in view of the public discussions in reference to affairs of local, but sometimes absorbing interest, at which all the qualified inhabitants of the town could be present, and in which all were authorized to take part. To substitute for such local legislation, where measures receive the sanction of law only after public interchange of opinions, the machinery of a "primary election" would be to degrade the whole system. That cannot be called a system of town government in which no deliberative assemblage is provided for, and in which a local law is adopted by the ballots of perhaps a bare majority, who vote secretly, and without consultation with the rest of the voters; who are actuated by motives which need not be

publicly avowed, or controlled by reasons the weakness of which would be exposed by a public discussion.

I think, therefore, first—This statute is void, because it did not become a law when it left the hands of the Legislature, but was to take effect only when it should be approved by a majority of the people of a township, and then only in the township where thus approved. Second—That this statute is not a law conferring upon towns any governmental or police powers.

Let the petitioner be discharged.

Mr. Justice RHODES and Mr. Justice CROCKETT dissented.

NOTE.—It is to be understood that the necessities of this case do not demand of the Court to determine what powers may be granted to the towns. It may be difficult, perhaps impracticable, to draw the line by general definition; but it is certain that all the powers of legislation cannot be conferred on the counties or towns. As was said by DOUGLAS, J., in *The People* v. *Collins*, 3 Mich. 415, "only powers of legislation over matters of local concern can be delegated. If the Legislature should attempt to invest the Boards of Supervisors with power to enact the entire Civil and Criminal Codes which should be in force within their respective counties, this would be manifestly in violation of the true intent and spirit of the Constitution."

It would be an entire abandonment by the Legislature of the power to pass general laws, and would be destructive of our government; resolving the State into petty districts, or communes, each with different laws, to be enforced only within its own borders.